UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– *against* –

DONALD BLAKSTAD,

Defendant.

**OPINION & ORDER**

19 Cr. 486 (ER)

R<small>AMOS</small>, D.J.:

Before the Court are a number of pretrial motions by Blakstad to transfer venue, Doc. 52, suppress evidence from several search warrants, Docs. 70, 72, secure a bill of particulars, Doc. 48, issue a Rule 17(c) subpoena, Doc. 35, to disclose or preserve *Brady*, *Giglio*, and Jencks Act material, Docs. 50, 56, and to condition the admissibility of summary charts on early disclosure, Doc. 54.  For the following reasons, all of Blakstad's motions are DENIED.

## I.    BACKGROUND

### A.  The Indictments

A Southern District grand jury returned the first of two indictments in this case in July 2019.  Doc. 2.  The indictment alleged an insider trading scheme led by Blakstad directed at Illumina, Inc., a San Diego biotechnology company listed on the Nasdaq in New York.  *Id.* ¶¶ 1, 3.  In addition to Blakstad, the alleged scheme included Martha Patricia Bustos, an accountant at Illumina who allegedly provided inside information to Blakstad, as well as four unnamed coconspirators.  *Id.* ¶¶ 2, 4–7, 20, 26.  In each alleged instance of insider trading, Blakstad would receive inside information from Bustos and either execute a profitable trade himself or pass the information to a coconspirator, who would then make the trade him or herself for personal benefit or for the benefit of Blakstad.  *Id.* ¶¶ 9–11.

This indictment alleged one count of conspiracy to commit securities fraud, two counts of securities fraud, one count of conspiracy to commit wire fraud, and one count of wire fraud. The alleged conspiracy involved the use of Bustos' information in sets of transactions that occurred in April 2016, October 2016, August 2017, and July 2018. Indictment ¶ 40. The April 2016 transaction involved "CC-4," a Florida-based friend and business associate of Blakstad. *Id.* ¶¶ 7, 14. The October 2016 transaction involved all of the coconspirators, including "CC-4," "CC-1," a San Francisco-based principal of a New York firm, "CC-2," a Manhattan-based owner of the same firm, and "CC-3," a California-based watchmaker, who attempted to act on the information Blakstad provided while CC-3 was in Manhattan. *Id.* ¶¶ 4–6, 18, 20. The indictment alleged that CC-1 transferred nearly $2.6 million to Blakstad via wires that traveled through Manhattan. *Id.* ¶ 19. The August 2017 transaction involved CC-2, CC-3, and CC-4, with the indictment alleging that Blakstad wired money through Manhattan and coordinated the purchase via phone calls and emails with the Manhattan-based CC-2. *Id.* ¶¶ 27, 28. The July 2018 transaction involved only CC-4. *Id.* ¶ 34. Blakstad was arrested on August 8, 2019, in the Southern District of California. *See* Doc. 12.

Another grand jury returned a superseding indictment in January 2020. Doc. 60. This indictment realleged the scheme contained in the original indictment, and it made new allegations regarding the April 2016, August 2017, and July 2018 transactions as they pertained to a Florida-based associate of Blakstad ("Associate-3").[1] *See, e.g.*, *id.* ¶¶ 16, 34, 42. The superseding indictment also added one count of conspiracy to commit securities and wire fraud, as well as one count of wire fraud. These new counts involved a scheme separate from the transactions allegedly driven by Bustos' inside information. This scheme involved only Blakstad and CC-4, wherein they solicited investments into

---

[1] Associate-1, a friend and business associate of CC-3, and Associate-2, a friend and business associate of Blakstad, are alleged to have made transactions based on the inside information as well. *See* Indictment ¶¶ 20, 26.

three different business.  Superseding Indictment ¶ 56.  Rather than invest the funds they raised in those businesses, Blakstad and CC-4 allegedly used the funds to make luxury purchases for themselves.  *Id.* ¶ 59.  One of the alleged victims of the scheme was Associate-3.  *See id.* ¶ 58.

### B.  Issued Warrants

Before either indictment was issued and Blakstad was arrested, the Government obtained four warrants relevant to this motion.  The first warrant was directed to Microsoft in October 2018, Doc. 71 ex. A ("Microsoft Warrant"), and the second to Apple in November 2018, Doc. 71 ex. B ("Apple Warrant").[2]  Based on affidavits by FBI Special Agent Sylvia Marakas, Magistrate Judge Parker in the case of the Microsoft warrant and Magistrate Judge Lehrburger in the case of Apple found that there was probable cause to believe that one Microsoft MSN email account and four Apple iCloud accounts contained evidence of securities fraud and wire fraud involving insider trading in violation of sections 2, 371, 1343, 1348 and 1349 of Title 18 of the U.S. Code, sections 78j(b) and 78ff of Title 15, and section 240.10b-5 of Title 17 of the Code of Federal Regulations.  Microsoft Warrant at 4; *id.* attach. A at 2 (identifying violations of these provisions the "Subject Offenses"); Apple Warrant at 1, *id.* attach. A at 2.  The magistrate judges directed Microsoft and Apple to produce all emails sent or received after January 1, 2015, as well as files, history, address book information, subscriber information, transactional records, customer correspondence, service information, and backup data from the accounts.  Microsoft Warrant attach. A at 1–2; Apple Warrant attach. A at 1–2. The warrants then permitted law enforcement to look for evidence associated with the Subject Offenses, specifically including:

> a.  Evidence of communications relating to [Illumina], including communications with individuals with access to, or in possession of, material nonpublic information regarding Illumina;

---

[2] The warrants were issued pursuant to the Stored Communication Act, which requires a warrant for the production of certain data maintained by online service providers.  18 U.S.C. § 2703.

    b.   Evidence relating to the conveyance of material non-public information relating to Illumina;

    c.   Evidence relating to taking actions for the benefit of individuals with access to, or in possession of, material nonpublic information regarding Illumina;

    d.   Evidence relating to transactions in Illumina securities, as well as evidence of the ownership and control over brokerage accounts used to conduct such transactions;

    e.   Evidence relating to identities and locations of, and communications with, coconspirators;

    f.   Evidence relating to the relationship between Martha Patricia Bustos and Donald Blakstad;

    g.   Evidence relating to the relationship between Donald Blakstad and, respectively, [two other co-conspirators];

    h.   Evidence relating to the state of mind of individuals conducting transactions in Illumina securities and/or in possession of material nonpublic information regarding Illumina;

    i.   Evidence relating to brokerage accounts, bank accounts, other email addresses, and/or phone numbers used by the individual(s) controlling or using the Subject Accounts and/or other individuals who traded in Illumina securities or had access to or were in possession of material nonpublic information regarding Illumina;

    j.   Evidence relating to the proceeds of any trading in Illumina securities, including the transfer and disposition of any such proceeds;

    k.   Evidence of the geographic location of user of the Subject Accounts, as well as the computer or device used to access the Subject Accounts;

    l.   Evidence relating to efforts to conceal the Subject Offenses and evade law enforcement and/or regulatory agencies; and

    m.   Evidence reflecting the location of other evidence of the Subject Offenses.

Microsoft Warrant attach. A at 2–3; *see also* Apple Warrant attach. B at 2–3 (listing a substantially identical set of evidence sought).

In the affidavits on which both warrants were based, the affiant, Special Agent Marakas, described the procedures that would be used to review the information produced by Microsoft and Apple. Marakas indicated that law enforcement personnel

would conduct a "cursory inspection" of all information in the accounts, in addition to the use of keyword searches, because data in images, for example, may not be discoverable through text search, and because "it is impossible to know in advance all of the unique words or phrases" suspects may use.  Doc. 80, exs. 1 ¶ 21, 2 ¶ 30.  The Government represents in its briefing that it used a filter team to "segregate[] material that was potentially protected by attorney–client privilege" and provided to Blakstad both the entirety of what was produced by Microsoft and Apple and what the Government deemed responsive to the warrants.  Doc. 73 at 17.

The third and fourth warrants were issued by Magistrate Judge Moses in April and July 2019, addressed to Verizon, Sprint, T-Mobile, and AT&T, and directed at obtaining cellphone location information and prospective call logs.  Doc. 73 exs. A, B.  Together, the two warrants targeted eight cellphones.  *Id.* ¶ 1.  Judge Moses found probable cause that evidence of "criminal insider trading" would be "reveal[ed]" through prospective and historical location information of the targeted cell phones, and she found that call log information would be relevant to the Government's ongoing investigation into Blakstad. *Id.* ¶¶ 2, 4.  The warrants directed the cell phone providers to produce prospective location data for a period of 45 days from the dates of the warrants, prospective call log information for a period of 60 days from the dates of the warrants, and historical data dating from March 2, 2019 for the April warrant and June 1, 2019 for the July warrant. *Id.* ¶ 7–9.

Both of these warrants were supported by affidavits, with Marakas swearing out the affidavit supporting the April warrant and FBI Special Agent Jennifer Riker swearing out the affidavit supporting the July warrant.  Doc. 80, exs. 3, 4.  In addition to reviewing the evidence of the schemes described in the indictments, Marakas averred that the Government sought the location and call log data of target cellphones to track their movements and aid in seizing them simultaneously at a later time.  Doc. 80, ex. 1 ¶ 34. In her affidavit, Riker averred that the cell phone data sought in the July warrant would

assist in locating and arresting Blakstad, specifically noting that Blakstad kept residences in both San Diego and Las Vegas.  Doc. 80, ex. 2 ¶ 6.

### C.  Procedural History

The Court held an initial pretrial conference in August 2019.  At that conference, two New York-based attorneys appeared in person for Blakstad, and a third attorney, San Diego-based Eugene G. Iredale, moved for admission *pro hac vice*.  The Court scheduled a second pretrial conference in October 2019 to provide time for defense counsel to review discovery provided by the Government.  At that October conference, attended in person by Iredale, Blakstad indicated that he planned to move for a transfer of venue to San Diego, in addition to other pretrial motions.  Blakstad properly filed his first set of pretrial motions in December 2019.  The Government filed a superseding indictment in January 2020, and the parties met for another pretrial conference in February.  At that conference, the Court set a trial date in November 2020 and granted Blakstad leave to file additional pretrial motions.  Blakstad filed those motions in May 2020.  In August 2020, due to the impact of the COVID-19 pandemic, the Court adjourned the jury trial *sine die*.

## II.   MOTION TO TRANSFER VENUE

Blakstad first moves the Court to transfer his case to the Southern District of California, primarily because he currently lives in San Diego.  That motion is DENIED. A court "may transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice."  Fed. R. Crim. P. 21(b).  "Disposition of a Rule 21(b) motion is vested in the sound discretion of the district court."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 966 (2d Cir. 1990).  When deciding such motions, courts look to ten factors articulated by the Supreme Court in *Platt v. Minnesota Mining & Manufacturing Co.*, 376 U.S. 240, 243–44 (1964):

1.  location of the defendants;

2.  location of the possible witnesses;

3. location of the events likely to be at issue;

4. location of relevant documents and records;

5. potential for disruption of the defendants' businesses if transfer is denied;

6. expenses to be incurred by the parties if transfer is denied;

7. location of defense counsel;

8. relative accessibility of the place of trial;

9. docket conditions of each potential district; and

10. any other special circumstance that might bear on the desirability of transfer.

*Maldonado-Rivera*, 922 F.2d at 966.  "As a general rule, a criminal prosecution should be retained in the original district in which it was filed, and defendants bear the burden of justifying a transfer."  *United States v. Riley*, 296 F.R.D. 272, 275 (S.D.N.Y. 2014) (internal quotations and citations omitted).

Although not dispositive, the first *Platt* factor weighs in Blakstad's favor, as he currently resides in San Diego.  *See Platt*, 376 U.S. at 245.

The second factor is neutral.  As the burden of justifying a transfer rests on Blakstad, he must specifically describe how particular witnesses would be entirely prevented from testifying at trial in the Southern District of New York.  *See United States v. Spy Factory, Inc.*, 951 F. Supp. 450, 556–57 (S.D.N.Y. 1997) (Sotomayor, J.).  Indeed, the one case he cites in his favor illustrates the need for a particularized showing, with the court only finding that transfer was warranted after the defendant had identified specific character witnesses who would be unable to travel from Houston to Chicago.  *See United States v. Radley*, 558 F. Supp. 2d 865, 878 (N.D. Ill. 2008).  In contrast to the defendant in *Radley*, Blakstad has not identified anyone who would testify on his behalf or what they would testify to, merely asserting that his "witnesses are located in Southern California," and that bringing them to Manhattan "can make their use impractical."  Doc. 53 at 2.  This "naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice for transfer."  *Spy Factory*, 951 F. Supp. at 456; *see also United States v. Brooks*, No. 08 Cr. 35 (PKL), 2008 WL 2944626, at *2 (S.D.N.Y. July 31, 2008)

(finding "bare assertion" of hardship in bringing witnesses to Manhattan from Alabama insufficient in tipping second *Platt* factor in defendant's favor). Given that the Government has not identified its witnesses yet, either, this factor does not lean in favor of either party.

The third factor, concerning the location of the events at issue, is neutral. Blakstad argues the alleged tipster worked in San Diego, where Illumina is located, as did he. In favor of trial in New York, the Government notes that CC-3 was based in Manhattan, as was his firm, that Illumina was listed on a New York stock exchange, the Nasdaq, and that several calls, emails, and wire transfer moved through Manhattan. Furthermore, CC-4 and Associate-3, one of the alleged victims of the securities fraud described in the superseding indictment, are based in Florida. "Because the criminal activity that was alleged to have occurred in this case was concededly national in scope, the location of the events at issue favors neither side." *Spy Factory, Inc.*, 951 F. Supp. at 457; *see also United States v. Ebbers*, No. 02 Cr. 1144 (BSJ), 2004 WL 2346154, at *1 (S.D.N.Y. Oct. 18, 2004) (finding third factor did not weigh in favor of transfer when securities fraud involved national company listed on Nasdaq and Government's case involved conversations with New York entities).

The fourth factor, the location of relevant documents and records, is also neutral. The Government represents that all discovery materials have been converted to a digital format and produced to defense counsel. *See United States v. Datta*, 797 F. Supp. 2d 448, 450 (S.D.N.Y. 2011) (finding that electronic format of documents "neutraliz[ed] any issue concerning the location of documents").

The fifth factor, the potential for disruption of the defendant's business, does not weigh in favor of transfer. Blakstad's bare assertion that "[t]ravel across the United States will cause substantial disruption to defendant's business and life," Doc. 52 at 3, is belied by the fact that he has already traveled to New York twice for pretrial conferences without apparent difficultly. Without more, the Court cannot find that this factor weighs

in Blakstad's favor. *See Spy Factory*, 951 F. Supp. at 459 (finding this factor weighed "slightly" in defendants' favor after defendants provided specific impact of trial on their livelihoods).

The sixth factor, the expenses to be incurred by the parties, is also neutral. As with several of the preceding arguments, Blakstad simply asserts that "[t]ravel costs to New York and the expense of hotel lodging in Manhattan present significant costs." Doc. 52 at 3. He further claims that there would be costs to transport and house unnamed witnesses, as well as out-of-state trial counsel. *Id.* This is not enough, however, to show that he is "financially incapable of funding [his] defense" were this trial — expected by the Government to take about two weeks — to stay in New York. *Spy Factory*, 951 F. Supp. at 459 (finding that the expenses of a two-*month* trial in New York did not counsel in favor of transfer). Although the Government specifies that transferring would require moving two Assistant U.S. Attorneys, a paralegal, and two or more law enforcement agents to San Diego, the Court finds the costs of transporting and housing attorneys and related staff would be roughly similar between the parties. *See United States v. Carey*, 152 F. Supp. 2d 415, 423 (S.D.N.Y. 2001).

The seventh factor, location of counsel, weighs in favor of maintaining this action in New York. The Government's two attorneys are based in New York, while Blakstad's single primary counsel is located in San Diego. Although Blakstad has retained local counsel in New York, he has represented that his counsel from San Diego will try his case. As more attorneys are based in New York than San Diego, this factor suggests that keeping trial in Manhattan will be less costly and more convenient for the parties. *See Spy Factory*, 951 F. Supp. at 460.

The eighth factor, relative accessibility of the venues, is neutral. Both New York and San Diego have major international airports available. *See Spy Factory*, 951 F. Supp. at 460.

The ninth factor, docket conditions, is also neutral.  Although this trial was adjourned due to the COVID-19 pandemic, jury trials have since begun again in the Southern District and the Court expects it will soon reschedule this case for trial. Blakstad has not presented any information that suggests the relative docket conditions in San Diego are any different.

In support of moving the trial based on the tenth factor, special circumstances, Blakstad argues that the ongoing COVID-19 pandemic could endanger at least himself and Bustos, the alleged source of Blakstad's inside information, because of the need for travel to New York from San Diego.  He further represents that he is particularly at risk of serious illness or death given his age, weight, and pre-existing conditions.

But this is an argument against holding any trial at all, rather than *where* to hold the trial.  The pandemic is a rapidly evolving situation, with the disease spreading across the entire country during the pendency of this motion.  As of October 6, 2020, according to data compiled by the *New York Times*,[3] San Diego County reported 1926 cases in the previous seven days, or 58 cases per 100,000 people.  New York City, by contrast, has reported 3826 cases in the previous seven days, or 45 cases per 100,000 people.  That data can and likely will change between now and trial.  Nevertheless, the courthouses here have developed protocols necessary to conduct in-person trials safely.[4]  Without more, the Court will not weigh this factor in favor of transferring this case to San Diego.[5]

---

[3] *Covid in the U.S.: Latest Map and Case Count*, N.Y. Times (last updated Oct. 6, 2020), https://nyti.ms/39jvJEY.

[4] U.S. Dist. Ct. for S. Dist. of N.Y., *Resuming Jury Trials in the SDNY* (2020), https://nysd.uscourts.gov/sites/default/files/local_rules/Plan%20for%20Resuming%20Jury%20Trials.pdf.

[5] The Government additionally argues, under the sixth factor, that Blakstad impermissibly delayed filing this motion.  The Court finds that this argument is best considered as a "special circumstance," rather than a matter of expense.  *See Spy Factory, Inc.*, 951 F. Supp. at 461.

Although Blakstad did not indicate that he would bring this motion to transfer venue until October 2019, approximately three months after the initial indictment was filed, the Court does not find he was untimely. The Court will not weigh the time it has taken to brief and consider this motion against Blakstad.

In sum, the only factor counseling in favor of transfer in this case is Blakstad's residence in San Diego, while all other factors are either neutral or weigh slightly in the Government's favor.  Given the presumption that a case should remain in the venue in which it was filed, Blakstad has failed to carry his burden to persuade the Court to order transfer to the other side of the country.  Accordingly, his motion to transfer venue is DENIED.

## III.   MOTIONS TO SUPPRESS

Blakstad seeks to suppress two sets of evidence:  "all evidence obtained by the government as a result of the execution of overbroad warrants on defendant's iCloud and Microsoft Accounts," Doc. 70, and "all evidence obtained as a result of warrants for cell phone location data," Doc. 72.  For the following reasons, both motions are DENIED.

### A.  Relevant Law

The Fourth Amendment to the U.S. Constitution requires that "no warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized."  In evaluating a warrant, therefore, a reviewing court must determine whether the warrant in question was sufficiently particular and whether the warrant was supported by probable cause.  *See United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013).  The duty of the reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed."  *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) (citing *Jones v. United States*, 362 U.S. 257, 271 (1960)) (internal quotation marks omitted).  "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists."  *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993).

The Second Circuit has articulated three requirements a warrant must meet for it to be considered sufficiently particular:  "First, a warrant must identify the specific offense for which the police have established probable cause.  Second, a warrant must describe the place to be searched.  Third, the warrant must specify the items to be seized

by their relation to designated crimes." *Galpin*, 720 F.3d at 445–46 (internal citations and quotations omitted). Essentially, "the warrant must enable the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992). In the context of a digital search, like the ones discussed here, the Second Circuit has counseled that courts should express "a heightened sensitivity to the particularity requirement." *Galpin*, 720 F.3d at 447.

When determining whether the warrant is supported by probable cause, courts must recall that probable cause is a "flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). "[O]nly the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause." *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238.

Even if a court finds that a warrant is defective, it will not order that the resulting evidence be suppressed so long as the Government demonstrates that the evidence was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984); *accord United States v. Clark*, 638 F.3d 89, 99–100 (2d Cir. 2011). Given, however, that courts afford a presumption of reasonableness to searches conducted pursuant to a warrant, *Clark*, 638 F.3d at 100, there are only four circumstances under which good faith exception will not apply:

> (1) where the issuing magistrate has been knowingly misled;
>
> (2) where the issuing magistrate wholly abandoned his or her judi-cial role;
>
> (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and

(4) where the warrant is so facially deficient that reliance upon it is
   unreasonable.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992).

**B. Apple iCloud & Microsoft Accounts**

*1. Particularity*

The Government has shown that the warrants authorizing searches of the iCloud accounts and the MSN email account were sufficiently particular, according to the test laid out in *Galpin*, 720 F.3d at 445. *First*, the warrants indicated that the magistrate had found probable cause of securities and wire fraud involving insider trading in violation of provisions within Titles 15 and 18 of the U.S. Code and Title 17 of the Code of Federal Regulations. Blakstad does not argue otherwise.

*Second*, the warrants indicated the specific accounts that were to be searched as well as the types of data that the Government would review. With regards to emails, for example, the warrant directed that only messages created or received in or after January 2015 would be provided to the Government. In response, Blakstad complains that the warrant did not specify any search protocols and in fact required law enforcement officers to look through all files in order to find what they were looking for; in other words, the warrant did not state with particularity the specific folders (*i.e.*, places) within the accounts to be searched. But Blakstad does not point to any authority from the Second Circuit or the Supreme Court to suggest such protocols are required in a warrant for digital evidence. In reality, "[u]nlike the Ninth Circuit, [the Second Circuit has] not required specific search protocols or minimization undertakings as basic predicates for upholding digital search warrants." *Galpin*, 720 F.3d at 451. Rather, "the manner in which a warrant is executed is subject to *later* judicial review as to its reasonableness." *Dalia v. United States*, 441 U.S. 238, 258 (1979) (emphasis added); *accord United States v. Grubbs*, 547 U.S. 90, 97–98 (2006) ("Nothing in the language of the Constitution or in th[e] Court's decisions interpreting that language suggests that . . . search warrants also must include a specification of the precise manner in which they are to be executed.").

The Court finds that the search of these accounts was reasonable.  As Special Agent Marakas averred in her affidavits, a keyword search protocol alone would not be sufficient to find all relevant evidence in the accounts.  Indeed, courts have specifically recognized the limitations of keyword searches, because, after all, "few people keep documents of their criminal transactions in a folder marked 'drug records.'"  *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990).  Furthermore, the use of a filter team protected against any privileged information from being produced to the particular lawyers prosecuting this case against Blakstad.  And, despite being provided the full dataset seized and the records the Government has deemed responsive, Blakstad has failed to identify any specific record that should not have been provided to the Government or deemed responsive pursuant to the warrant.

*Third*, the warrant provided 13 categories of evidence for law enforcement to seek, relating each category to the investigation of the identified offenses.  But Blakstad, citing only Ninth Circuit law, argues that the 13 categories of evidence law enforcement were allowed to seize were not specific enough for a searching officer to distinguish evidence of a crime from otherwise lawful material.  Doc. 71 at 7 (citing *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)).  No reasonable reading of the warrants suggests that Blakstad is correct in his analysis.  For example, category (a) directs the officer to look for evidence of communications with individuals who have access to material, non-public information — precisely the type of information that forms the core of the Government's case here.  Categories (b) through (d) and (i) through (j) all relate to the transfer of non-public information and its use in transactions involving the stock of Illumina, the company Blakstad targeted.  Categories (e) through (h) relate to Blakstad's relationships with his coconspirators, and categories (k) through (m) relate to the location of additional evidence regarding the Subject Offenses.  Indeed, Blakstad does not explain how these categories could "describe the items more particularly in light of the information available to [the Government] at the time the warrant was issued."  *Spilotro*, 800 F.2d at

963.  To the contrary, these detailed warrants were sufficiently particular to satisfy the Fourth Amendment.  *See, e.g.*, *United States v. Jacobson*, 4 F. Supp. 3d 515, 523–24 (E.D.N.Y. 2014) (finding warrant sufficiently particular when it cited particular federal crimes, limited search to digital media at a certain office, and enumerated ten categories of evidence to guide search).

 *2.  Overbreadth*

 Blakstad argues that, although the cores of the warrants were supported by probable cause, they authorized too sweeping of a search.  Specifically, he argues that the warrants contained "no explicit time limitation."  Doc. 71 at 9.[6]  In this argument, Blakstad confuses the description of the data to be searched by the Government, *i.e.*, the data that Apple and Microsoft provided, and the data to be *seized* by the Government, *i.e.,*, the data that the Government deemed responsive and was to keep for potential use in this case.  The Supreme Court has observed, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized."  *Andresen v. Maryland*, 427 U.S. 463, 482 n.11 (1976).  Courts have interpreted this in the context of digital searches to mean that the Government may first obtain all potentially relevant data from a service provider and then inspect them to determine whether that data is responsive to the warrant.  *See, e.g.*, *In re a Warrant for All Content & Other Info. Associated with the Email Account xxxxxxx gmail.com Maintained at Premises Controlled by Google, Inc.*, 33 F. Supp. 3d 386, 391 (S.D.N.Y. 2014), *as amended* (Aug. 7, 2014); *United States v. Bowen*, 689 F. Supp. 2d 675, 682 (S.D.N.Y. 2010), *aff'd sub nom. United States v. Ingram*, 490 F. App'x 363 (2d Cir. 2012).

---

[6] Blakstad also argues that there was no protocol for separating reviewable from non-reviewable data.  This argument fails to persuade the Court for the same reasons Blakstad's arguments concerning a lack of search terms fail.  *See supra* Part III.B.1.

With this distinction in mind, the warrant limited its *seizure* authorization to evidence associated with the 13 categories of evidence discussed above, all supported by probable cause.  Furthermore, the warrant limited the search of email messages to a period of approximately 15 months before the first allegedly unlawful transaction — a reasonable restriction given, for example, that evidence of a prior relationship among co-conspirators can be relevant in establishing that Bustos' stood to benefit from providing inside information and that Blakstad knew of this fact, *see United States v. Martoma*, 894 F.3d 64, 74 (2d Cir. 2017).  *See also United States v. Pinto-Thomas*, 352 F. Supp. 3d 287, 307 (S.D.N.Y. 2018) (finding that warrant authorizing search of data relating to insider trading scheme was not overbroad because it lacked limiting timeframe).  Data dated after the allegedly unlawful transactions is relevant, as well — it may show evidence of how the proceeds from the transactions were distributed and to whom.

### 3.  *Good Faith Reliance*

Even if this Court were to find that the magistrate judges had erred in their issuance of these warrants, it would deny Blakstad's motion because law enforcement relied upon the warrants in good faith.  In opposition, Blakstad solely argues that the warrants were so facially deficient that reliance upon them would be unreasonable.  But, for reliance on a warrant to be unreasonable, a Court must determine that "a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization."  *United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987) (quoting *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)).  Given that Blakstad has pointed to no controlling authority suggesting, for example, that search protocols or a narrow timeframe were necessary for a warrant of this type, the Court finds implausible that any officer would think the searches to be illegal in the face of the authorizations by Judge Parker and Judge Lehrburger.

### 4. Standing

Finally, Blakstad has not made any attempt to establish his standing to challenge the search of any of these accounts. "When considering a claimed violation of Fourth Amendment rights, the burden is on the defendant to establish that his own rights under the Fourth Amendment were violated." *United States v. Paulino*, 850 F.2d 93, 96 (2d Cir. 1988) (citing *Rakas v. Illinois*, 439 U.S. 128, 134, 138–39 (1978)). It is long established that a defendant can meet this burden only by submitting an affidavit by someone with personal knowledge that establishes his privacy interest in the thing that was searched. *See, e.g.*, *United States v. Lauria*, No. 19 Cr 449 (NSR), 2020 WL 5743523, at *6 (S.D.N.Y. Sept. 25, 2020). As Blakstad has submitted nothing, he has failed to carry his burden, and his motion is denied on this independent basis.

### C. Cell Phone Historical Location Information

Blakstad argues that the warrants authorizing seizure of historical location information from the cell phone providers were unsupported by probable cause, mainly because the unlawful activity alleged in the affidavits ceased long before the warrants were issued.[7] Rather than arguing that the historical information itself would be evidence of a crime, the Government counters that the information sought was to be used in locating the cell phones themselves, as well as their users.

Regardless of the existence of probable cause for the seizure of the historical location data, Blakstad has failed to present any affidavit suggesting he had an expectation of privacy in the historical location information, compelling his motion's denial. And the Court, absent any argument to the contrary, finds that the Government's reliance on Judge Moses' issuance of the warrant was reasonable. Accordingly, his motion to suppress the historical cell phone location data is DENIED.

---

[7] Although Blakstad cites *Carpenter v. United States*, 585 U.S. ----, 138 S. Ct. 2206 (2018), it is inapposite to this case. In *Carpenter*, the Supreme Court held, "Before compelling a wireless carrier to turn over a subscriber's [cell site location information], the Government's obligation is a familiar one — get a warrant." *Id.* at 2221. The Government did so here.

## IV.    BILL OF PARTICULARS

Blakstad seeks a bill of particulars from the Government that describes "the specific information the prosecution claims to be the forbidden 'Inside Information.'" Doc. 49 at 1.  Because the Court finds that he has received that information through pretrial discovery, his motion is DENIED.

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling [the] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987).  "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y.), *aff'd*, 875 F.2d 857 (2d Cir. 1987) (summary order).  "It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case.  The court must be cognizant of the fact that a bill of particulars confines the government's evidence at trial to the particulars furnished." *United States v. Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985).

"Therefore, the proper test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is *necessary* for the defense, not whether it would aid the defendant in his preparation." *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (emphasis added).  "Whether to grant a bill of particulars rests within the sound discretion of the district court," *United States v. Panza*, 750 F.2d 1141, 1148 (2d Cir. 1984), after considering "the totality of the information available to the defendant — through the indictment, affirmations, and general pre-trial

discovery." *United States v. Thompson*, 2013 WL 6246489, at *7 (S.D.N.Y. Dec. 3, 2013).

The Government argues that the information it has provided through its indictments and pretrial discovery is more than adequate to inform Blakstad of the nature of pending charges. The indictments note that Bustos gave Blakstad inside information concerning Illumina's financial condition in advance of specific earnings releases. And the Government represents that it produced to Blakstad emails he allegedly received from Bustos ahead of those earning releases. Furthermore, the Government represents that in its discovery are numerous search warrant affidavits that detail the Government's case, including at least one example of inside information and the timing of communications between Bustos and Blakstad. Indeed, the Government indicates that it identified those search warrant affidavits in a phone call with Blakstad's attorney, and it notes that the discovery was electronically searchable and included indices with Bates ranges. Blakstad does not suggest that any of these representations are incorrect.

This case, as far as insider trading cases go, is quite simple. There is one inside tipster, one company, and four earnings releases that spurred allegedly unlawful transactions. Given the single source of inside information and the limited number of allegedly unlawful transactions, additional information beyond that provided in discovery and the indictments is not necessary for Blakstad's defense. *Compare with United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 2788168, at *2 (granting bill of particulars for insider trading case "spanning six years and involving dozens of stocks, dozens of co-conspirators, and a total of seven conspiracies as charged in the indictment"). *See also United States v. Stewart*, No. 15 Cr. 287 (LTS), slip op. at 21–22 (S.D.N.Y. Jan. 19, 2016), Doc. 64 (denying motion for bill of particulars when a single tipster was charged with providing information in advance of five sets of transactions).

To be sure, the Government's production is voluminous, and bills of particulars may be ordered when the prosecution inundates the defense team with numerous files to

sift through. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1982). But the Government has provided multiple tools to allow Blakstad to prepare his defense. He can search for Bustos' communications with the other coconspirators, he can rely on the Government's search warrant affidavits to preview the Government's case, and his attorneys have already spoken directly with the Government about what is contained in the production. "[T]he mere existence of "mountains of documents" does not entitle [Blakstad] to a bill of particulars. *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010). In reality, given the details contained within the Government's production and the manner in which it is organized, this production makes any potential bill of particulars of limited marginal use, and certainly not necessary for Blakstad's defense. Accordingly, his motion is DENIED.

## V.     ISSUANCE OF RULE 17(C) SUBPOENA

Blakstad seeks Court approval of a subpoena directed at Illumina, demanding the production of the following three categories of documents:

1. The Human Resources (personnel) file of Martha Bustos, including, but not limited to, specific description of job title; work assignments; and name(s) of supervisor(s) for the period of 1 January 2016 through 31 December 2016; any documents relating to her termination from employment at Illumina, the reasons for such termination, and any memorialization of statements she provided in regards to her termination;

2. Any and all documents, reports, statements, or evidence relating to any investigation of Ms. Bustos' conduct with respect to her access to, and use of, confidential financial information between 1 January 2016 and 3 December 2018; and

3. Any and all e-mail correspondence on Illumina owned or controlled media from Martha Bustos during the following periods: 1 April – 30 April, 2016; 1 July – 30 July 2016; 1 October – 30 October 2016; 1 January – 30 January 2017; 1 April – 30 April 2017; 1 July - 30 July 2017; 1 October - 30 October 2017; 1 January – 30 January 2018; 1 April - 30 April 2018; 1 July - 30 July 2018; 1 October - 30 October 2018.

Doc. 47 at 3. He argues that the subpoenaed information is admissible because it tends to show:

- Ms. Bustos' access, or lack of access, to confidential financial information;

- [S]tatements she gave to her employers regarding her conduct; any relevant information obtained by any internal Illumina investigation of the underlying acts; and

- [C]orrespondence and other data showing her communications (or lack of communication) during the time immediately before and after the dates of the quarterly announcements of Illumina earnings, profits, and projections.

*Id.* at 3–4 (bullets added).  He baldly asserts that the information is "not otherwise procurable" and that it will "allow for proper trial presentation."  *Id.* at 4.

Rule 17 of the Federal Rules of Criminal Procedure allows for a party to subpoena documents for use as evidence at trial.  Notably, it is not a method of discovery that supplements Rule 16.  *See United States v. Nixon*, 418 U.S. 683, 698 (1974).  In *Nixon*, the Supreme Court adopted a four-part test articulated by Judge Weinfeld of this District:

(1) that the documents are evidentiary and relevant;

(2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence;

(3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and

(4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Id.* at 699–700 (citing *United States v. Iozia*, 13 F.R.D. 335, 338 (S.D.N.Y. 1952)).  In other words, the party seeking issuance of the subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity."  *Id.* at 700.  "Courts have consistently interpreted the admissibility standard of Rule 17(c) to preclude production of materials whose evidentiary use is limited to impeachment."  *United States v. Cherry*, 876 F. Supp. 547, 553 (S.D.N.Y. 1995) (collecting cases); *see also Nixon*, 418 U.S. at 701–02 ("[T]he need for evidence to impeach witnesses is insufficient to require its production in advance of trial.").

With these principles in mind, the Court must deny Blakstad's motion for a Rule 17 subpoena.  The breadth of Blakstad's request suggests that he is in fact fishing for impeachment evidence for use against Bustos, should she testify.  For example, rather than asking for specific parts of Bustos' personnel file and proving to the Court how they would be relevant or admissible, he seeks the entirety of her file, including all documents related to her termination from Illumina.  Furthermore, he has not shown that he is unable to get this same information through the normal channels of Rule 16 discovery, especially given that the Government represents that it has already turned over a significant number of documents originally secured from Illumina.  And, finally, he has made no showing that these documents — including email correspondence and summaries of internal Illumina investigations — would be admissible, rather than excluded by the hearsay rule or some other bar.   Accordingly, his motion is DENIED.

## VI.   PRESERVATION & DISCLOSURE OF EXCULPATORY & IMPEACHMENT MATERIAL

Blakstad moves for disclosure of exculpatory and impeachment material pursuant to *Brady v. Maryland*, 373 U.S. 834 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), as well as the preservation of witness interviews pursuant to the Jencks Act, 18 U.S.C. § 3500.  Because the relief he requests is unnecessary at this time, his motions are DENIED.

As a general rule, *Brady* and its progeny do not require *immediate* disclosure of all exculpatory and impeachment material upon request by a defendant.  *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001).  In *Coppa*, the Second Circuit observed that the law appears settled as to when the prosecution must make a disclosure required by *Brady*: "*Brady* material must be disclosed in time for its effective use at trial."  *Id.* at 144.  Courts do, however, have some "discretion to order pretrial disclosures as a matter of sound case management."  *Id.* at 146.  Relatedly, the Jencks Act does not require pretrial production of statements made by witnesses before trial at all, instead allowing the defendant to

request those materials only after that witness has testified on direct examination at trial. 18 U.S.C. § 3500.

The Government has affirmed that it understands its obligations to preserve and produce exculpatory evidence and impeachment materials in a reasonable time before trial, and the Court accepts this representation.  As Blakstad has suggested no basis for the Court to conclude otherwise, his motions in this regard are DENIED.

## VII.   SUMMARY CHARTS

Rule 1006 of the Federal Rules of Evidence allow a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Rule 1006 does not list any requirement of advance notice.  Blakstad requests that the Court condition admissibility of any such charts on the Government providing reasonable advance notice.  The Government represents that it not yet created any summaries, that it intends to produce any such charts in a reasonable time before trial, and that it has already disclosed any underlying records with which it would create such charts.  Accordingly, an Order from the Court regarding summary charts is unnecessary and not compelled by any Federal Rule.  Blakstad's motion is DENIED.

## VIII.   CONCLUSION

For the foregoing reasons, Blakstad's pretrial motions are DENIED.  As the Court directed in its Order of August 19, 2020, the parties are directed to submit a joint status report by October 19, 2020.  The Clerk of Court is respectfully directed to terminate the motions:  Docs. 35, 48, 50, 52, 54, 56, 70, and 72.


It is SO ORDERED.


Dated:    October 9, 2020
          New York, New York

 

EDGARDO RAMOS, U.S.D.J.