UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA          :

       – v. –            :       S2 19 Cr. 486 (ER)

DONALD BLAKSTAD,          :

             Defendant.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

### THE GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
Attorney for the United States of America

Edward A. Imperatore
Jared Lenow
Assistant United States Attorneys
     - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 2

STATEMENT OF FACTS ............................................................................................... 2

    **I.**    The Insider Trading Scheme.................................................................... 3

    **II.**    Blakstad's Advance-Fee Investment Scheme ........................................ 6

DISCUSSION ................................................................................................................ 8

    **I.**    THE SENTENCING GUIDELINES CALCULATION ......................................... 8

    **II.**    A TEN-YEAR TERM OF IMPRISONMENT IS WARRANTED ...................... 15

        **A.**    Nature and Circumstances of the Offense and Need for Just Punishment ......... 15

        **B.**    Blakstad's History and Characteristics .................................................. 16

        **C.**    The Need for Specific Deterrence, to Promote Respect for the Law, and to Protect the Public From Future Crimes of the Defendant.................................. 17

        **D.**    The Need for General Deterrence .......................................................... 18

        **E.**    Blakstad's Section 3553(a) Arguments ................................................ 18

        **III.**    FORFEITURE .......................................................................................... 23

    **IV.**    RESTITUTION......................................................................................... 23

    CONCLUSION ......................................................................................................... 24

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant Donald Blakstad and in response to Blakstad's sentencing submission ("Def. Mem."). As discussed below, Blakstad's advisory Guidelines range is 135 to 168 months' imprisonment. In light of the seriousness of Blakstad's offenses and the compelling need to afford specific and general deterrence, provide just punishment, promote respect for the law, and protect the public from future crimes of the defendant, the Government submits that a below-Guidelines sentence of ten years' imprisonment is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.[1]

## STATEMENT OF FACTS

On June 29, 2021, following a two-week trial and less than two hours of deliberations, Blakstad was convicted by a jury on all counts of Indictment S2 19 Cr. 486 (ER) (the "Indictment").   The Indictment charged Blakstad with five insider trading counts: conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371 (Count One); two counts of securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 (Counts Two and Three); conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count Four); and wire fraud, in violation of Title 18, United States Code, Section 1343 (Count Five). The Indictment also charged Blakstad with two investment fraud counts: conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371 (Count

---

[1] Throughout this memorandum, "GX" refers to Government exhibits that were introduced at trial; "Tr." refers to the trial transcript; and "PSR" refers to the Final Presentence Investigation Report.

Six), and wire fraud, in violation of Title 18, United States Code, Section 1343 (Count Seven).

At trial, extensive documentary evidence and witness testimony proved that Blakstad orchestrated two brazen and calculated criminal schemes: an insider trading scheme and an investment fraud scheme against numerous investors, which together netted more than $6 million in criminal profits.   To prove its case at trial, the Government called nearly a dozen witnesses over the course of two weeks, including Martha Bustos, a cooperating witness who conspired with Blakstad, investor victims whom Blakstad defrauded, and three summary witnesses who summarized documentary evidence of the schemes and Blakstad's criminal profits.   The Government also introduced hundreds of exhibits, which included, among other things, emails and text messages reflecting the pattern of Blakstad's receipt of inside information and his and his associates' illegal trading on that information, emails and a written private placement memorandum that Blakstad provided to investors that contained material misrepresentations, and bank and brokerage records reflecting Blakstad's receipt of criminal proceeds and his use of those proceeds to fund his lavish lifestyle.   The evidence proved the following:

I.      **The Insider Trading Scheme**

In or about 2011 or 2012, Blakstad befriended Martha Bustos, a certified public accountant employed in the accounting department at Illumina, Inc. ("Illumina"), a publicly traded biopharmaceutical company headquartered in California.   At the time, Bustos was in her early 20s, and Blakstad was in his early 50s.   (Tr. 139).   Blakstad entertained Bustos, took her out for lavish dinners and drinks, and traveled with her and her friends.   Blakstad portrayed himself to Bustos as a wealthy and successful businessman who worked in the clean energy industry.

Over the years, Blakstad groomed Bustos, and the two became increasingly close.   In early 2016, Blakstad began to obtain illegal inside information about Illumina's financial condition in the second quarter of 2016 from Bustos, whom Blakstad knew was an accountant with access to Illumina's financial results.   After Bustos mentioned to Blakstad that Illumina was going to "prerelease" its earnings, Blakstad repeatedly questioned Bustos about the timing of the prerelease, whether Illumina would miss its earnings projections, and by how much.   (Tr. 155-57).   Bustos gave Blakstad the information he wanted, and Blakstad then shared the inside information he received from Bustos with his associates, who used that information to make millions of dollars in out-of-the-money options trading in Illumina securities.

Blakstad understood that he could compromise Bustos's trusted position within Illumina and that she would provide him with the inside information he wanted.   As Bustos testified, for more than two years, Blakstad questioned Bustos on a quarterly basis about Illumina's financial results before they were released to the public.   As the end of Illumina's quarter approached, Blakstad repeatedly pressed Bustos for Illumina's top-line revenue and earnings per share, which were two of the company's most significant financial metrics, and the timing of any prerelease of earnings.

Although Bustos expressed reluctance to Blakstad about sharing inside information, Blakstad gave her a false sense of assurance that he would not "do anything stupid" or share the inside information with others and that nobody would find out.   (Tr. 159-60).   Blakstad directed Bustos "never ever to text him or email him anything" and that they should discuss inside information only in person or over the phone.   (Tr. 161).   He further directed Bustos that if she were ever questioned about tipping Blakstad, she should deny it.   (Tr. 162, 230).   As Blakstad

became increasingly "paranoid" about being detected, he also told Bustos to communicate with him over WhatsApp, an encrypted cellphone-based text message application.   (Tr. 227).

Although Blakstad obtained inside information from Illumina from Bustos on a quarterly basis for more than two years, from 2016 through 2018, Blakstad told Bustos that he traded on the inside information only if Illumina would miss its earnings expectations or exceed its expectations by a wide margin.   (Tr. 161).   In total, Blakstad and his associates traded in Illumina based upon inside information on at least five occasions.   Blakstad himself traded in advance of Illumina's October 2016 prerelease, August 2017 earnings release, and October 2017 earnings release.   For example, after Blakstad received inside information from Bustos in October 2016, Blakstad directed two investment professionals and co-conspirators, Michael Winston and Ryan Morris, to purchase Illumina call options on Blakstad's behalf in Morris's brokerage account just hours before an earnings prerelease in order to conceal Blakstad's involvement in the trading.   Blakstad directed Winston and Morris to wire the proceeds of his trades—nearly $2.7 million—to an account held by his purported energy company Midcontinental Petroleum.  (Tr. 1398).   Rather than being used for the business purposes of an energy company, the account was used hide Blakstad's insider trading in Illumina securities and to funnel the money to Blakstad personally.

Blakstad also tipped his associates in advance of five different earnings announcements so that they could profit from the inside information Blakstad had received from Bustos.   For example, Blakstad told his associate, Robert Maron, in advance of an Illumina earnings announcement: "Don't blow this opportunity . . . You will want to kill yourself."   (GX-800).

As Blakstad continued to receive inside information from Bustos, they grew increasingly close, and Blakstad's spending on Bustos increased.   For example, after Blakstad made more than

a million dollars by insider trading in Illumina options in October 2016, Blakstad took Bustos and her friends on a lavish Thanksgiving vacation to New York City, where he provided her with cocaine.   Blakstad also gave Bustos cash on two occasions and bought her gifts.   As Bustos testified about Blakstad:

> I never really had someone put me in that position before, where they're asking me for stuff like this. And he was my friend, and -- I mean, I think he was -- at this point he had been so generous with me that I felt like I kind of owed it to him, and so I gave it to him. And you know, like, I think a part of it was also just my own greed. Right? I -- like, he introduced me to a world I, you know, hadn't been a part of, and so I wanted to keep being invited to his parties and being part of those events, so I think partially it was my own greed too.

(Tr. 154).

In total, Blakstad and his associates earned $6,205,436 in criminal profits from the insider trading scheme.   (GX-50, at 63).   Blakstad himself earned $3,951,477.   (*Id.*)   Blakstad did not file tax returns or report the proceeds of his Illumina trades to the Internal Revenue Service during the period of his insider trading scheme.

## II.   Blakstad's Advance-Fee Investment Scheme

At the same time that Blakstad was engaged in insider trading in Illumina, he was also committing a brzen advance-fee investment fraud scheme against investors.   The evidence at trial proved that from 2015 through 2019, Blakstad and his associate, Michael Ciprianni, fraudulently induced victim investors to make up-front, lump-sum investments for purported securities issued by Midcontinental Petroleum, which Blakstad then misappropriated, in substantial part.

Blakstad solicited his victims over the phone and in person.   He won their trust and falsely promised them that their money would be used to fund energy projects.   Blakstad provided each of his victims with a fraudulent "private placement memorandum" and other documents that

6

falsely represented to investors that their investment funds would be maintained in a company bank account pending their use, that investors would receive a 6 percent annual interest rate on their investments, and that proceeds would be used solely to fund the business operation.   (GX-612).   In reality, Midcontinental Petroleum was a shell company with little to no business operations, no apparent revenue, and few prospects for profitable operations, and Blakstad misappropriated funds invested with Midcontinental Petroleum for his personal purposes, in substantial part, rather than directing the funds towards legitimate business purposes.   For example, Blakstad spent hundreds of thousands of dollars in investor proceeds on, among other things, lavish meals, luxury hotels, and tens of thousands of dollars in cash withdrawals.

The evidence at trial established that Blakstad fraudulently induced at least seven victims to invest a total of approximately $1,469,000 in Midcontinental Petroleum.   Five of the victims lost the entirety of their investment.   Blakstad returned $50,000 to Hobble Creek, representing half of its investment, after the investor requested his money back.   Another victim, after investing $750,000 in Midcontinental Petroleum based on fraudulent representations, subsequently agreed to convert his investment in Midcontinental Petroleum into a purported loan to Blakstad, which Blakstad never repaid.

The lifecycle of Blakstad's investment fraud reveals the calculated nature of his scheme. After Blakstad defrauded an investor and spent the investors' money, Blakstad recruited new victims with the same lies.   For example, in 2015, Blakstad tricked Shawn Johnstun, a rancher and builder whom he had befriended, into entrusting $100,000 to Blakstad for a purported investment.   (Tr. 520).   Blakstad repeatedly lied to Johnstun about the nature of the investment, falsely claiming that the investment would be used to fund energy projects.   After receiving the

investment from Johnstun in the Midcontinental Bank account that Blakstad controlled, Blakstad quickly spent Johnstun's money.   Just months later, Blakstad targeted a new victim—Corey Liuget, a professional football player—and solicited a substantial investment from Liuget using very same lies that Blakstad had told to Johnstun and the same private placement memorandum containing lies about the investment.   Blakstad continued defrauding investors until mid-2019, more than four years after he first defrauded Johnstun and Liuget.   Blakstad took steps to prevent his investment fraud from coming to light, including by funneling the proceeds of his scheme through shell company bank accounts, failing to report the proceeds of the scheme on his tax returns, and stringing along investors after they had been defrauded.

## DISCUSSION

## I.    THE SENTENCING GUIDELINES CALCULATION

The Guidelines range for Blakstad's criminal offenses is calculated as follows:

1.  Pursuant to U.S.S.G. §§ 3D1.1(a)(1), 3D1.2(d), an 3D1.3(b), Counts One, Two, and Seven are grouped together as a single group because the offense level is determined largely on the basis of the total amount of loss or harm.

2.  Pursuant to U.S.S.G. § 2B1.4(a), the base offense level is 7.[2]

---

2 The Government submits that the base offense level is 8, not 7, as incorrectly calculated in the Presentence Report. (PSR ¶ 44).   U.S.S.G. § 3D1.3(b) provides: "In the case of counts grouped together pursuant to §3D1.2(d), the offense level applicable to a Group is the offense level corresponding to the aggregated quantity, determined in accordance with Chapter Two and Parts A, B and C of Chapter Three. When the counts involve offenses of the same general type to which different guidelines apply, apply the offense guideline that produces the highest offense level." Similarly, U.S.S.G. § 3D1.3 application note 3 provides: "When counts are grouped pursuant to §3D1.2(d), the offense guideline applicable to the aggregate behavior is used. If the counts in the Group are covered by different guidelines, use the guideline that produces the highest offense level. Determine whether the specific offense characteristics or adjustments from Chapter Three, Parts A, B, and C apply based upon the combined offense behavior taken as a whole."   Here, the offense that produces the highest offense level is insider trading, which has a base offense level of

3. Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because the loss amount resulting from the offenses is more than $3,500,000, but less than $9,500,000, 18 levels are added.

4. Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense resulted in substantial financial hardship to one or more victims, 2 levels are added.

5. Pursuant to U.S.S.G. § 2B1.1(b)(10)(A), because the offense involved sophisticated means, 2 levels are added.

6. Pursuant to U.S.S.G. § 3B1.1(c), because the defendant was an organizer, leader, manager, or supervisor in criminal activity, 2 levels are added.

7. Pursuant to U.S.S.G. § 3C2.1, because the defendant obstructed justice by committing perjury during his trial testimony, 2 levels are added.

In accordance with the foregoing calculations, the applicable offense level is 33.

Based upon the calculations set forth above, at Criminal History Category I, Blakstad's Guidelines range is 135 to 168 months' imprisonment.  The Probation Office concurs with the Guidelines calculation set forth above in all respects, except that consistent with its usual practice the Probation Office takes no position on obstruction of justice and defers to the assessment of the District Court.   The Probation Office recommends a sentence of 72 months' imprisonment (without taking an obstruction enhancement into account).

In his objections to the Presentence Report and sentencing submission, Blakstad challenges the loss amount and certain of the enhancements applicable to his conduct.   As set forth below, his arguments are contrary to the facts and the law and should be rejected.[3]

---

8 pursuant to U.S.S.G. § 2B1.4(a).  Nevertheless, in an abundance of caution, the Government does not object to a Guidelines calculation that begins at offense level 7.

3 Blakstad's self-serving grouping analysis is incorrect for the reasons discussed in the Presentence Report, U.S.S.G. § 3D1.3(b), and U.S.S.G. § 3D1.3 application note 3.

9

### A.  The Loss Amount Is Correctly Calculated

The loss amount attributable to Blakstad's conduct far exceeds $3,500,000 and thus results in an 18-level increase, as required by U.S.S.G. § 2B1.1(b)(1)(J).

The evidence at trial demonstrated that Blakstad and his tippees traded on inside information surrounding five Illumina earnings announcements.   On four of those occasions, the trading was highly profitable, and netted approximately $6,205,436 in profits.   (GX 50 at 63). On the other occasion, in October 2017, the market did not respond to the earnings announcement as Blakstad and his co-conspirators anticipated, and this resulted in trading losses of approximately $871,249.   (GX 50 at 50).   Accordingly, even taking into account the losses in October 2017, the criminal profits from the insider trading scheme alone well exceed the $3.5 million threshold under U.S.S.G. § 2B1.1(b)(1)(J).

With respect to Midcontinental Petroleum, the proof at trial demonstrated that the defendant defrauded seven investors in Midcontinental Petroleum: Corey Liuget ($150,000), Hobble Creek Investments ($100,000, of which $50,000 was repaid by Blakstad), Jason Boriss ($119,000), John Ozkan ($50,000), Donald Luneburg ($250,000), Joseph DiScala ($50,000), and White Sands Advisors ($750,000).   For the reasons set forth in the Government's post-trial briefing, White Sands was an investor in Midcontinental Petroleum, and was defrauded of $750,000 pursuant to the investment fraud scheme charged in Counts Six and Seven.

Accordingly, even a conservative view of the total loss amount on the insider trading scheme and the investment fraud scheme (reflecting the November 2017 insider trading losses and disregarding any loss to White Sands) is $6,003,187, well above the $3.5 million threshold.

**B.  An Enhancement for Substantial Financial Hardship Is Warranted**

A two-level enhancement is warranted under USSG § 2B1.1(b)(2)(A) because the offense "resulted in substantial financial hardship to one or more victim."  In determining whether a victim suffered substantial financial hardship, the Guidelines commentary provides a non-exhaustive list of factors for the Court to consider, including whether "the offense resulted in the victim . . .  suffering substantial loss of a retirement, education, or other savings or investment fund."  U.S.S.G. § 2B1.1 n.4(F).

Here, at least one investor, Jason Boriss, suffered substantial financial hardship.  Boriss invested and lost $119,000, which was the entirety of his retirement savings at the time of his investment.  (Tr. 719 ("Q. And how big of a chunk of your retirement was this investment? A. It was my entire retirement from the five or six years before I started my company.")).  Although Blakstad relies on a letter that he obtained from Boriss stating that "not having this money did not cause me financial hardship or change my standard of living" because "I am not able to access anything in the account for another 14 years" (Def. Ex. 3), Blakstad overlooks that Boriss unquestionably lost his entire six-figure retirement savings he had accrued to date, which qualifies under the plain text of the Guidelines commentary.  *See, e.g.*, *United States v. Poulson*, 871 F.3d 261, 272 (3d Cir. 2017) (upholding application of enhancement to husband-and-wife victims who together lost $21,000 in retirement savings, where the loss forced them to restart their retirement savings "from scratch," and rejecting argument that Government had not demonstrated that victims had to postpone their retirement).

### C.  An Enhancement for Sophisticated Means is Warranted

The trial proof demonstrated well beyond a preponderance of the evidence that Blakstad's scheme involved sophisticated means.   Under the Guidelines, sophisticated means is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense" and specifically includes "hiding assets or transactions, or both, through the use of fictitious entities, [or] corporate shells."   U.S.S.G. § 2B1.1 App. Note 9(B).

Blakstad overlooks that his offense conduct in both schemes fits squarely within this definition.   With respect to the insider trading scheme, Blakstad sought to conceal his insider trading transactions by having others execute those trades in brokerage accounts that were not held in Blakstad's name and then transferring the profits of insider trading to a shell company bank account in the name of Midcontinental Petroleum, which Blakstad then further diverted or spent. With respect to the investment fraud scheme, Blakstad transferred certain victim funds through accounts held in the names of multiple different corporate shells (Midcontinental Petroleum then Northern Alternative Energy) before ultimately largely spending the funds on personal expenses. Blakstad did so to evade detection and prolong his scheme.   This conduct therefore mirrors the Guidelines commentary.

### D.  A Role Enhancement Is Warranted

The evidence at trial proved that Blakstad was the organizer and leader of the insider trading scheme, and provided direction to at least one other participant in the scheme.   A two-level role enhancement under U.S.S.G. § 3B1.1(c) is thus warranted.

In considering a role enhancement, "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the

recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (n.4). A "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n.1). "A defendant is properly considered a manager or supervisor 'if he exercised some degree of control over others involved in the commission of the offense . . . or played a significant role in the decision to recruit or to supervise lower-level participants.'" *United States v. Russell*, 513 F. App'x 67, 69 (2d Cir. 2013) (quoting *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002)).

Here, Blakstad planned and orchestrated the insider trading scheme, recruited Bustos, Morris, and Winston into the scheme, and exercised a degree of control over each of them. Blakstad decided when to trade on the inside information and to share inside information with others, and he enjoyed a large share of the fruits of the scheme. Blakstad also exercised a degree of control and oversight over Bustos and provided direction to her on multiple occasions. For example, Blakstad directed Bustos (1) to communicate with him orally only and not to put any inside information in email or text message, (2) to deny the scheme if she were ever questioned about it, and (3) to communicate over WhatsApp toward the end of the scheme. (Tr. 161-62, 227, 230). Similarly, Blakstad recruited both Winston and Morris into the scheme and provided direction to them on how and when to execute options trades in Illumina. (*See, e.g.*, GX-801 (directing Morris and Winston as to the type of put option contracts to purchase and further directing "let's not sell any options until we talk I'll be awake by 6 am pst").

Blakstad's providing direction or oversight as to a single participant in the scheme is

sufficient for the two-level role enhancement to apply.  *United States v. Birkin*, 366 F.3d 95, 101 (2d Cir.2004) ("To qualify for the enhancement, a defendant need only have managed or supervised one participant.").

### E.  An Enhancement for Obstruction of Justice Is Warranted

The two-level enhancement for obstruction of justice pursuant to § 3C1.1 squarely applies in this case based upon Blakstad's extensive perjury from the witness stand during trial.

"[A] defendant's right to testify does not include a right to commit perjury."  *United States v. Dunnigan*, 507 U.S. 87, 96 (1993).  "Under a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines." *Id.* at 98.  "To base a § 3C1.1 enhancement for 'Obstructing or Impeding the Administration of Justice' upon the giving of perjured testimony, a sentencing court must find that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter."  *United States v. Salim*, 549 F.3d 67, 73 (2d Cir. 2008) (internal quotation marks and brackets omitted).  "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence."  *United States v. Cassiliano*, 137 F.3d 742, 747 (2d Cir. 1998).  "In determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence."  *Id.*

Blakstad perjured himself extensively during more than two days of trial testimony.  For example:

- Blakstad repeatedly lied about his solicitations of investors and use of their investment proceeds.  For example, Blakstad falsely claimed that he had invested millions of dollars of his own money into Midcontiental Petroleum and that Magic Jack was a means of repaying Midcontinental investors.  His false testimony is contradicted by significant

14

documentary evidence and his own testimony on cross-examination.   (*See, e.g.*, Tr. 1422).

- Blakstad repeatedly lied about his purported lack of involvement in insider trading.   For example, Blakstad falsely claimed that his trading in Illumina securities was based on public information, including past financial performance, a change in management, and a rumored acquisition, and not inside information from Bustos.   (Tr. 1183, 1351-1375). Blakstad's claims are squarely contradicted by Bustos's testimony and extensive documentary evidence, including telephone and trading records, and Blakstad's own text messages to Maron.

## II.   A TEN-YEAR TERM OF IMPRISONMENT IS WARRANTED

As discussed above, Blakstad's Guidelines range is 135 to 168 months' imprisonment. The Government submits that a sentence of ten years' imprisonment is sufficient but not greater than necessary to serve the legitimate purposes of sentencing in view of the compelling need to reflect the seriousness of the offense, provide deterrence, afford deterrence, promote respect for the law, and protect the public from future crimes of the defendant.   18 U.S.C. §§ 3553(a)(1), (a)(2).

### A.  Nature and Circumstances of the Offense and Need for Just Punishment

The nature and circumstances of Blakstad's offenses and the need to provide just punishment warrant a very significant sentence.   Blakstad's criminal misconduct was brazen and egregious.   During a period of more than four years, Blakstad committed both an insider trading scheme and an investment fraud scheme against numerous investors.   Both schemes were fueled by Blakstad's greed, and in both schemes Blakstad preyed upon and manipulated others in an effort to enrich himself.   Overwhelming evidence established that Blakstad made misrepresentations to induce investor victims to give him large sums of money and then diverted the proceeds of these scheme in a series of transactions through shell companies that he controlled.   Blakstad then funneled hundreds of thousands of dollars of investor funds and insider trading proceeds to himself

and used them to fund his lavish lifestyle.    Blakstad's fraud caused significant harm to investors, who collectively lost approximately $1,419,000 by entrusting their hard-earned money to him. One investor lost his entire retirement, and Blakstad strung his investors along for years after he had stolen their money.    Blakstad did not file tax returns or report the proceeds of his schemes.

Similarly, Blakstad committed insider trading for nearly three years by grooming Bustos, who was approximately thirty years his junior, and then manipulating her to obtain valuable secret information about Illumina's financial condition.    Blakstad also structured options transactions through two co-conspirators – Morris and Winston – in order to derive huge profits from the stolen information and conceal his involvement in the scheme.    He also tipped his associates so that they could profit and instructed Bustos to lie if she were ever confronted by authorities.    Blakstad's manipulation of Bustos ultimately resulted in a felony conviction for Bustos and destroyed her career.    Blakstad personally derived millions of dollars in criminal profits through both schemes. And he obstructed justice by lying extensively to the jury while under oath from the witness stand.

His egregious misconduct and lies warrant a significant sentence.

### B.  Blakstad's History and Characteristics

Unlike many of the defendants who appear before this Court, Blakstad has enjoyed a life of material and financial comfort about which most Americans can only dream.    It is evident from the Presentence Report and Blakstad's background and personal circumstances that he did not commit this crime out of any pressing financial need.    By Blakstad's own account, he has been a successful businessman who made millions of dollars in business prior to the instant scheme, and he has enjoyed status in his community and the support of family and friends.    He has led a life of personal and financial stability, filled with benefits that many people never receive.    But that was not enough for him.    Motivated by greed and a contempt for the law, Blakstad simultaneously

16

perpetrated a brazen insider trading scheme and a scheme to defraud investors, and spent the money he stole on himself – on personal credit card bills, lavish trips, luxury cars, and rent for a luxury apartment – and engaged in a cover-up to prevent his scheme from being detected.   His commission of lucrative financial crimes in spite of his many advantages weighs in favor of a substantial sentence.

The conduct at issue, moreover, was not a brief aberration for Blakstad.   His schemes were calculated, systemic, and pervasive.   Blakstad committed both the insider trading scheme and the investment fraud scheme at approximately the same time.   In both schemes, Blakstad manipulated others and betrayed their trust, and he did so in order to maximize his criminal profits.   Blakstad also took sophisticated steps to hide his crimes, including directing Bustos to lie if she were ever questioned about their conduct, structuring trades in Illumina in the accounts of co-conspirators, and funneling investor proceeds through shell companies.

Blakstad's history and characteristics are likewise reflected in his campaign to obstruct justice and in his contempt for the Court and the law.   Blakstad's obstructive conduct—which involved lies to the Court and the jury from the witness stand—goes to the heart of the criminal justice system and reflects his sense of entitlement and view that he is above the law.   These aggravating facts weigh decidedly in favor of a significant sentence.

### C. The Need for Specific Deterrence, to Promote Respect for the Law, and to Protect the Public From Future Crimes of the Defendant

There is a very compelling need in Blakstad's case for specific deterrence, to promote respect for the law, and to protect the public from future crimes.   Blakstad's lack of remorse for his crimes and callous indifference to the plight of both his investors and Bustos underscores a need to deter further conduct by him and by others who contemplate defrauding investors and

committing insider trading.   Blakstad's obstruction of justice through his perjured trial testimony also underscores the compelling need to deter him adequately from engaging in future misconduct. Blakstad's efforts to subvert the truth-finding function of the jury show that Blakstad is undeterred from committing crimes and unwilling to accept responsibility for blatant criminal misconduct.

### D.  The Need for General Deterrence

The need for general deterrence is also particularly important.   Because investment fraud and insider trading schemes like Blakstsad's are both highly lucrative and difficult to detect and investigate, significant punishment is necessary to deter others from similar conduct.   *See United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").   Should Blakstad receive a light sentence, financial professionals may be emboldened to engage in similar crimes, knowing that such schemes are difficult to detect and that, even if they are caught, they will not face significant repercussions.   In addition, a lenient sentence would further erode the public's confidence in the integrity of financial markets by sending the message that financial professionals are only lightly punished when caught engaging in white-collar crimes.   To deter criminal conduct by individuals like Blakstad and effectuate the purpose of the securities laws, and send an appropriate message that this type of fraud will not be tolerated, a significant sentence is accordingly warranted.

### E.  Blakstad's Section 3553(a) Arguments

Blakstad makes a number of arguments that, he claims, warrant a sentence of only two years' imprisonment, well below the Guidelines range.   (Def. Mem. 13).   Those arguments primarily relate to Blakstad's background and family ties, his health, and his support network of

friends.   These arguments are meritless and should be rejected.

First, Blakstad claims that he should receive a well-below Guidelines sentence because of his family ties and good acts.   As an initial matter, there is no connection between Blakstad's family and his decision to commit the crimes at issue.   He was not committing fraud, in other words, to provide for himself or his family; he was doing it out of greed and to enrich himself.   It is of course true that a sentence of incarceration may create difficulties for a defendant's family, but that is the case in nearly every prosecution—and it was Blakstad who placed his family in this situation by choosing to engage in criminal conduct.   Blakstad's family, moreover, is better situated than most others to absorb the impact of his incarceration.   In fact, Blakstad appears to acknowledge that he is not a caretaker for his 36-year-old adult son, who resides with his mother. (Def. Mem. 22-23).   Nor does Blakstad, a San Diego resident, reside with his elderly mother, who instead lives with her daughter in Nevada.   While addressing the issue outside of the context of Section 3553(a), the Guidelines make clear that family responsibilities are "not ordinarily relevant in determining whether a departure may be warranted."   *See* U.S.S.G. § 5H1.6; *see also United States* v. *Dyce*, 91 F. 3d 1462, 1466 (D.C. Cir. 1996) (holding that a departure on the basis of family ties or responsibilities is appropriate only if the case "significantly differs" from the norm); *see also id.* (noting that "Congress has directed the Sentencing Commission to 'assure that the guidelines and policy statements . . . reflect the general inappropriateness of considering the . . . family ties and responsibilities . . . of the defendant'") (quoting 28 U.S.C. § 994(e)).   There is nothing unique or different about Blakstad's family circumstances that would warrant their consideration here.

Blakstad's purported good acts are of no more help.   Those acts tend to consist of being

financially generous with friends, which is easy to do when funded with fraud proceeds. Ironically, Blakstad relies in part on letters from recipients of proceeds of his crimes in advancing this argument.   Katrina Para, for examples, states in a letter that Blakstad has given "selflessly" of his "resources" to friends.   (Def. Ex. 4).   Of course, Blakstad entertained Parra and other young women lavishly using the proceeds of his insider trading and investment fraud schemes.

The Court should likewise reject Blakstad's suggestion that his conduct was aberrational. (Def. Mem. 28-29).   As discussed above, there is no support for this contention.   The conduct at issue was not a one-time mistake.   It consisted of, among other things, a series of lies told to victims over a four-year period in order to steal money and his manipulation of Bustos to profit from stolen information.   And as the scheme progressed over a lengthy period of time, Blakstad's lies and conduct became even more brazen: he concocted ways to try to keep his scheme a secret, and he then lied extensively to the jury from the witness stand in an effort to avoid the consequences for his criminal misconduct.   Far from "aberrational," the conduct proven at trial extended for years and underscores a compelling need for specific deterrence.

Blakstad next claims that "the destruction of Mr. Blakstad's reputation and his permanent branding as a felon are punishment which reflect the seriousness of the offense, and promote respect for the law."  (Def. Mem. 5.).   This argument is meritless.   The prolonged lifecycle of Blakstad's frauds belies this claim.   Blakstad engaged in calculated conduct designed to maximize his profit and avoid detection, including refusing to pay taxes, using shell companies to funnel money, and structuring securities transactions through straw traders.   Blakstad's perjury on the witness stand underscores the need for a substantial sentence of imprisonment to deter future crimes by Blakstad.   In fact, Blakstad repeatedly testified that he was continuing to operate his

purported Midcontinental Petroleum business venture at the time of trial notwithstanding his arrest and prosecution, a disturbing fact that underscores the need for specific deterrence.   (Tr. 1474-75).

Blakstad's claims about his health fare no better.   Blakstad cites a number of physical conditions that appear to relate primarily to his obesity and "neurological and psychological evaluations of the defendant."   (Def. Mem. 25).   Neither a downward departure pursuant to USSG §§ 5H1.1 or 5H1.4, nor a variance pursuant to section 3553 is warranted on the grounds of health because Blakstad's physical and mental health—which appears to be stable—does not involve any grave or serious infirmity.   *See, e.g.*, *United States* v. *Turner*, 531 F. Supp.2d 123, 124-125, 127-128 (D.D.C 2008) (rejecting downward departure pursuant to USSG § 5H1.4 based upon age and infirmity in fraud case).   The Probation Office correctly observes that it has "considered the defendant's health issues and note that the Federal Bureau of Prisons is equipped to provide him with necessary care" (PSR at 36), and Blakstad does not argue to the contrary. Moreover, Blakstad's purported psychiatric evaluations are entitled to little weight, if any. Blakstad's counsel arranged for him to meet with a psychologist and a neurologist just one month before trial in an unsuccessful effort to find Blakstad incompetent to stand trial.   But Dr. Clipson, the psychologist, conducted only a "brief" consultation with Blakstad and apparently performed almost no diagnostic testing, and his report principally recounted Blakstad's own complaints about his physical and mental state.   (Def. Ex. 5).   The report of Dr. Lasker, the neurologist, found that Blakstad was competent, had received the highest possible score on a mental state examination, and, at most, showed signs of "mild" cognitive impairment that stemmed in substantial part from Blakstad's anxiety over his criminal case.   (Def. Ex. 4).   These purported "diagnoses" fall far

short of demonstrating any significant mental issue that would warrant any downward variance. In any event, the Court had the ability to observe Blakstad during a two-week trial, and the nature of both his offense conduct and perjured testimony undermine the defense's self-serving arguments.

The Court should reject Blakstad's request for a recommendation that he be enrolled in the Residential Drug Abuse Program ("RDAP") while in custody.  (Def. Mem. 32).  Such a request is disingenuous and reflects a thinly veiled effort to take advantage of a drug abuse program for deserving inmates in order to reduce his sentence.  According to the Presentence Report: "The defendant disclaimed the use of drugs since his arrest for the instant offense in July 2019, and he reported no history of substance abuse treatment, aside from an alcohol abuse program following a DUI conviction sustained approximately 25 years ago."  (PSR ¶ 84).  The Probation Office apparently does not recommend placement in RDAP notwithstanding Blakstad's request.

Finally, Blakstad claims that the Guidelines overstate the appropriate sentence and that below-Guidelines sentences are common in insider trading cases.   But the cases on which Bakstad relies are easily distinguishable.  *United States* v. *Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012), for example, involved an insider-trading case where the loss amount was driven by other people's trading.  This case, in contrast, involves not only a multi-year insider trading scheme orchestrated by the defendant and which generated millions of dollars in profits for the defendant, but also an extensive advance-fee scheme in which Blakstad lied to and stole money from numerous investors.  The stark contrast between Blakstad's conduct and the conduct in run-of-the-mill insider trading prosecutions demonstrates that Blakstad's offenses were exceptional and weigh decidedly in favor of a significant sentence of imprisonment.  Here, the loss amount and

22

the Guidelines enhancements applicable to Blakstad were a direct result of Blakstad's own knowing and systemic misconduct.  Blakstad's offenses and obstruction of justice in this case were egregious and would provide ample justification for a within-Guidelines sentence.   In any event, the Government does not seek a Guidelines sentence here but instead a below-Guidelines term of ten years' imprisonment.

### III.    FORFEITURE

The Government requests that, at sentencing, the Court order forfeiture in the amount of $4,518,103, reflecting $3,849,103 in Blakstad's insider trading proceeds plus $669,000 in Midcontinental Petroleum investor proceeds that were neither returned nor converted into a loan. A proposed preliminary forfeiture order is attached as Exhibit A.

### IV.    RESTITUTION

The Mandatory Victim Restitution Act ("MVRA") requires that a sentencing Court determine the amount of restitution payable to victims of the defendant's criminal offenses regardless of whether that victim is entitled to or has received compensation from some other source.  *See* 18 U.S.C. § 3664(f)(1)(A).   The Government requests that the Court order restitution in the amount of $669,000, reflecting losses to the following investors in the following amounts: Corey Liuget ($150,000), Hobble Creek Investments ($50,000), Jason Boriss ($119,000), John Ozkan ($50,000), Donald Luneburg ($250,000), and Joseph DiScala ($50,000).   The Government will submit a proposed restitution order and schedule of victims to the Court prior to sentencing.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a ten-year sentence of imprisonment for Blakstad is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:           /s/
        Edward Imperatore & Jared Lenow
        Assistant United States Attorneys