UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                        Plaintiff,

            – against –

DONALD BLAKSTAD,

                                        Defendant.

**OPINION & ORDER**

19 Cr. 486 (ER)

RAMOS, D.J.:

        At all times relevant to these motions, Defendant Donald Blakstad was the owner

and principal of Midcontinental Petroleum, Inc. ("Midcontinental" or "the Company"),

which purported to be in the business of soliciting investments in the oil and gas industry.

Second Superseding Indictment, Doc. 108 ("S2 Indictment"), at ¶ 3.

        In this action, the Government has alleged two types of fraudulent activity

orchestrated by Blakstad.  First, from approximately 2016 through 2018, Blakstad

participated in an insider trading scheme through which he obtained material nonpublic

information from Illumina Inc. ("Illumina"), a company headquartered in San Diego,

California, and traded Illumina securities based on that information.  *Id.* at ¶¶ 1, 8–9.

Blakstad obtained this information from Martha Patricia Bustos, an accountant at

Illumina, before it was released to the public.  *Id.* at ¶ 9.  After obtaining the information,

Blakstad effectuated profitable transactions in Illumina securities by tipping his co-

conspirators and other associates, and arranging for these individuals to purchase

Illumina securities for his benefit in accounts controlled by his co-conspirators and other

associates to avoid detection.  *Id.* at ¶ 10.  Specifically, Blakstad and these individuals

sold the Illumina securities at a significant profit following the public announcement of

Illumina's earnings.  Blakstad and his associates gained approximately $6 million in profits from purchasing and selling Illumina securities.  *Id.* at ¶ 11; *see also id.* at ¶¶ 12–43, 46.

Second, Blakstad and Michael Ciprianni, a Florida-based co-conspirator who was Blakstad's friend and business associate,[1] devised and operated a securities offering scheme to fraudulently obtain money from investors.  In order to effectuate the scheme, Blakstad caused investors to invest money through materially false representations, including representations made by telephone and email, and subsequently misappropriated a substantial portion of investor funds for his own use.  *Id.* at ¶ 55; *see also id.* at ¶ 59.

The Government charged Blakstad with seven counts, including conspiracy to commit securities fraud, securities fraud, conspiracy to commit wire fraud, and wire fraud under 18 U.S.C. § 371, 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.l0b-5, 18 U.S.C. § 2, 18 U.S.C. § 1349, and 18 U.S.C. §§ 1343 and 2.  *See id.*

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 1, 2019, the Government filed the original indictment.  On January 8, 2020, the Government filed the first superseding indictment (Doc. 60 ("S1 Indictment")).  On June 8, 2021, the Government filed the S2 Indictment.  Trial started approximately one week later, on June 14, 2021, and ended with the jury verdict of guilty on June 28, 2021.

On August 27, 2021, Blakstad filed three post-trial motions:  a renewed motion for acquittal on Count 6 of the S2 Indictment (Doc. 150 ("Mot. for Acquittal")), a motion

---

[1] In the S2 Indictment, Ciprianni is referred to as "CC-4."

for new trial (Doc. 151 ("Mot. for New Trial")), and a motion to dismiss Counts 6 and 7 (Doc. 152 ("Mot. to Dismiss")).[2]

For the reasons discussed below, Blakstad's motions are DENIED.

## II.   MOTION FOR ACQUITTAL

Blakstad renews his motion for acquittal pursuant to Federal Rule of Criminal Procedure 29(c), arguing that the evidence presented during trial was insufficient to sustain his conviction under Count 6 (conspiracy to commit securities fraud and wire fraud). Specifically, he argues that the Government failed to prove that Ciprianni ever knowingly participated in a scheme to fraudulently obtain money from victim investors and therefore that Blakstad did not conspire with anyone. Mot. for Acquittal at 1. Accordingly, "[i]f [] Ciprian[n]i is not guilty of conspiracy, [] Blakstad cannot be guilty of a conspiracy because the offense necessarily requires at least two people." *Id.* at 2. Thus, Blakstad argues that because no rational jury could find Ciprianni guilty of a conspiracy, Blakstad is entitled to acquittal on Count 6. *Id.*

In its opposition (Doc. 157 ("Opp. to Acquittal")), the Government argues that the evidence at trial showed that Ciprianni "was a knowing participant in the fraudulent scheme." Opp. to Acquittal at 37. Specifically, the Government points to evidence establishing that Ciprianni "helped solicit investors in Midcontinental [] for Blakstad, that Ciprianni was aware that Midcontinental [] investors were told that their investments would be put directly into the business, and that Ciprianni knowingly received kickback payments from investor funds in Midcontinental [] accounts (a use of funds that was

---

[2] In the S2 Indictment, Count 6 involves conspiracy to commit securities fraud and wire fraud in connection to the investment fraud scheme under 18 U.S.C. § 371. Count 7 involves wire fraud in connection to such scheme under 18 U.S.C. §§ 1343 and 2.

inconsistent with representations made to investors) after investors solicited by Ciprianni invested money in Midcontinental []." *Id.* (citing, among other things, trial testimony from investors in Midcontinental and email communications involving Blakstad and Ciprianni regarding Midcontinental and its investors).

### A.     Legal Standard

Federal Rule of Criminal Procedure 29(a) directs the Court to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." To succeed on a Rule 29(a) motion, the defendant must show, "considering all of the evidence, direct and circumstantial, that 'no rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (quoting *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003)). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted).  It is not the trial court's role to "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)).  Accordingly, a "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (quoting *Guadagna*, 183 F.3d at 130).  In assessing the sufficiency of the evidence supporting a guilty verdict, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the

government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (quoting *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008), *abrogated on other grounds by Dean v. United States*, 137 S. Ct. 1170 (2017)). Therefore, a defendant challenging the sufficiency of the evidence that was the basis of his conviction at trial "bears a heavy burden" when bringing a Rule 29(a) motion. *Id.* (quoting *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010)). The jury's verdict "may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995); *see also United States v. Aleskerova*, 300 F.3d 286, 292–293 (2d Cir. 2002).

The Court's "deference to the jury's findings is especially important" in conspiracy cases, "because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court." *Coplan*, 703 F.3d at 62 (quoting *United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010)). "In order to convict a defendant of the crime of conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010). "The record must [] permit a rational jury to find: (1) the existence of the conspiracy charged; (2) that the defendant had knowledge of the conspiracy; and (3) that the defendant intentionally joined the conspiracy." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (internal citations omitted). In order to prove a defendant joined a conspiracy, the government must show that he "knew of the conspiracy" and "joined it with the intent to commit the offenses that were its objectives . . . ." *United States v. Ceballos*, 340 F.3d 115, 123 (2d Cir. 2003) (internal citations omitted); *see also United*

*States v. Lange*, 834 F.3d 58, 76 (2d Cir. 2016) ("On a charge of conspiracy, the Government must prove (1) knowing participation or membership in the scheme charged and (2) some knowledge of the unlawful aims and objectives of the scheme." (internal quotation marks omitted)).  "The government's proof of an agreement does not require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct."  *United States v. Nusraty*, 867 F.2d 759, 763 (2d Cir. 1989) (internal quotation marks omitted).  "The government need not prove the defendant's familiarity with all of the conspiracy's details; it may demonstrate simply the defendant's awareness of the general nature and extent of the conspiracy."  *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) (internal quotation marks omitted).  "[T]he elements of a conspiracy may be proved by circumstantial evidence."  *United States v. Svoboda*, 347 F.3d 471, 477 (2d Cir. 2003).  For example, a defendant's "knowing and willing participation in a conspiracy may be inferred from . . . [his] presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others."  *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 113 (2d Cir. 2008) (quoting *Aleskerova*, 300 F.3d at 293).

The essential elements of securities fraud are:  (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341–342 (2005)).  The elements of wire fraud include:  (1) a scheme to defraud

(2) to get money or property (3) furthered by the use of interstate wires.  *Autuori*, 212

F.3d at 115.  "In order to prove the existence of a scheme to defraud, the government

must also prove that the misrepresentations were material, and that the defendant acted

with fraudulent intent."  *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (internal

citation and quotation marks omitted).  "A statement is material if the misinformation or

omission would naturally tend to lead or is capable of leading a reasonable [person] to

change [his] conduct."  *Id.* (internal quotation marks omitted) (alterations in original).

**B.    Discussion**

Here, viewing the evidence presented in the Government's case in the light most

favorable to the Government, as required on this motion for acquittal, a rational trier of

fact could have concluded that the elements of conspiracy to commit securities fraud and

wire fraud were established beyond a reasonable doubt.  According to testimony from

Blakstad, who testified in his defense at trial, and investors in Midcontinental, Ciprianni

solicited potential investors in Midcontinental for Blakstad, and at times served as the

conduit for communications between these investors and Blakstad.  *See* Tr. 443:18–

447:14 (Corey Liuget's testimony), 493:22–494:5 (same), 711:23–714:17 (Jason Boriss'

testimony), 745:20–746:23 (John Ozkan's testimony), 1433:6–1434:17 (Blakstad's

testimony).[3]  These investors believed, based on their interactions and communications

with Blakstad and Ciprianni, that Midcontinental had potential for success, and that their

money would be invested in the Company.  *Id.* at Tr. 720:4–722:5, 727:13–729:4.

Ciprianni was also aware of the agreements entered into as between the investors and

Blakstad in connection with Midcontinental.  *See id.* at Tr. 779:22–781:16, 790:8–24.

---

[3] References to "Tr." refer to the trial transcript.

Furthermore, according to emails between Ciprianni and Blakstad, Ciprianni received a portion of the funds related to Midcontinental accounts.  *See id.* at Tr. 781:17–783:16.

This evidence could permit a rational jury to find:  (1) the existence of a conspiracy to operate a securities offering fraud to fraudulently obtain and misappropriate money, including by wire transfer, from investors through the use of materially false representations, including those made by telephone and email; (2) that Ciprianni had knowledge of the conspiracy as evidenced by his solicitation of and involvement with investors for Midcontinental while receiving money; and (3) that Ciprianni intentionally joined the conspiracy as evidenced by his communications with investors and Blakstad. *See Santos*, 541 F.3d at 70.  The Government did not have to prove Ciprianni's familiarity with all of the details of the conspiracy, or that he expressly agreed with Blakstad on a course of action.  *Anderson*, 747 F.3d at 61.  The Government adduced evidence showing Ciprianni's awareness of the general nature and extent of the conspiracy and his tacit understanding to carry out the prohibited conduct.  *Id.*  Thus, the Government presented evidence from which a rational trier of fact could find the existence of a conspiracy to commit securities fraud and wire fraud beyond a reasonable doubt.  Therefore, Blakstad's motion for acquittal is DENIED.

## III.    MOTION FOR NEW TRIAL

Pursuant to Federal Rule of Criminal Procedure 33, Blakstad moves for a new trial on the following grounds:  (1) the Government witness, Paul Hinton, improperly testified as a summary witness pursuant to Federal Rule of Evidence 1006 as opposed to an expert under Federal Rule of Evidence 702, and relatedly, the Government allegedly failed to provide timely discovery as required for expert witnesses; (2) the Government

allegedly knowingly presented false testimony regarding Matt Tucci's alleged investment

in Midcontinental, which was subsequently converted to a personal loan; (3) the

Government allegedly engaged in constructive amendment of Counts 6 and 7 of the S2

Indictment; and (4) the Government's summation was improper in several respects,

thereby depriving Blakstad of a fair trial.

### A.    Legal Standard

"[O]n a Rule 33 motion to vacate, '[t]he ultimate test is whether letting a guilty

verdict stand would be a manifest injustice.'"  *United States v. Snype*, 441 F.3d 119, 140

(2d Cir. 2006) (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005))

(internal quotations omitted).  "In other words, '[t]here must be a real concern that an

innocent person may have been convicted.'"  *Id.* (quoting *Canova*, 412 F.3d at 349).

### B.    Discussion

#### i.    Hinton's Testimony

First, although the Government called Hinton a summary witness pursuant to Rule

1006, Blakstad argues that "the testimony Hinton provided was undoubtedly expert

opinion because it involved tracing and the application of forensic accounting methods."

Mot. for New Trial at 2.  Blakstad further alleges that Hinton's testimony "did not

exclusively summarize voluminous data, but instead presented conclusions based on

technical tracing principles beyond the knowledge of the average juror."  *Id.*  In support

of the argument that Hinton's testimony was not suitable for a layperson, Blakstad points

to the amount paid for Hinton's services as well as the size of Hinton's team.  Reply in

Support of Motion for New Trial, Doc. 159 ("Reply for New Trial"), at 3.  Accordingly,

Blakstad argues that "[t]he failure to give adequate advance notice of what was expert

testimony [pursuant to Rule 16], the failure to provide pretrial discovery of the evidence and exhibits, and the last minute midtrial production of a 122-page exhibit based on thousands of pages of financial records placed the defense in a position in which it could not adequately prepare, determine to retain its own expert, analyze or properly cross-examine the witness as to the substance of his testimony."  Mot. for New Trial at 5–6.

In its opposition to Blakstad's motion (Doc. 157 ("Opp. to New Trial")), the Government argues that Hinton's financial tracing testimony was not expert testimony. Evidence at trial included voluminous financial records, including records from bank accounts, brokerage accounts, and credit card accounts.  The Government alleges that the financial flows reflected in those records were relevant to both the charged insider trading and investment fraud charges.  Opp. to New Trial at 8.  These flows were "clear on the face of the underlying records, and comprehensible to a layperson examining the records."  *Id.* at 9.  In support of its argument that Hinton was a proper summary witness, the Government points to the Court's previous ruling on this very issue and case law permitting summary witness testimony on tracing analysis.  *Id.* at 14–17.  The Government argues that, similar to the witnesses in those cases, Hinton, while having the background and experience to offer expert testimony as to technical accounting matters and tracing methodologies, did not testify based on his expertise or technical knowledge. *Id.* at 17.  Instead, he testified to his application and the results of the "last in, first out" tracing methodology.  *Id.* at 16.  Moreover, the Government argues that none of the cases cited by Blakstad support his argument that Hinton improperly gave expert accounting testimony, and that he does not cite a single case holding that the application of a "last in, first out" tracing approach requires expert testimony.  *Id.* at 17.  Instead, Blakstad "cites

cases in which parties affirmatively sought to introduce forensic accountant testimony under Rule 702, and in all but one of those cases it is apparent that the expert's opinions went beyond the mechanical application of a tracing principle and included opinions." *Id.* at 17–18.  Furthermore, the Government also relies on cases allegedly supporting its position that summary witnesses can testify to the mechanical application of tracing analysis.  *See id.* at 14–17.  Defense counsel distinguishes the Government's cases, specifically *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) and *United States v. Cuti*, 720 F.3d 453 (2d Cir. 2013), because they allegedly involve percipient witnesses with factual involvement in the underlying events of the case.  Reply for New Trial at 1–2.

On April 26, 2021, approximately seven weeks before trial, the Government disclosed to Blakstad that Hinton would testify as a summary witness concerning the financial records, noting that the Government was prepared to qualify Hinton as an expert witness, if necessary, and describing the tracing analysis.  Opp. to New Trial at 9–10 (citing Doc. 109-1).  On May 24, 2021, approximately three weeks before trial, the Government first provided the defense with Hinton's draft summary charts, including a tracing analysis, which was primarily based on records of Blakstad's own accounts that had been produced to Blakstad in August 2019, approximately two years prior to trial.  *Id.* at 10.  On June 10, June 17, and June 20, 2021, the Government provided revised summary charts, which illustrated the same point as in the May 24 charts.  *Id.*  On June 21, the Court permitted Blakstad's counsel to *voir dire* Hinton outside the presence of the jury to assess whether Hinton would testify as a summary witness under Rule 1006, or whether he would need to testify as an expert under Rule 702.  *Id.*  After the *voir dire*, the

Court held that Hinton's testimony was not expert testimony, and was properly admitted pursuant to Rule 1006.  *Id.*

Therefore, the Government contends that it made "significant disclosures" concerning Hinton's testimony, *id.* at 18, and that Blakstad cannot establish unfair prejudice from Hinton's testimony in light of such disclosures.  *Id.* at 22.  Moreover, the Government notes that Blakstad did not dispute "the central point of Hinton's summary testimony at trial:  that after investor funds were deposited in Midcontinental [] corporate bank accounts, the ensuing debits from those accounts were largely for personal expenditures," *id.* at 22, or "the . . . testimony relating to the insider trading scheme:  that Blakstad transferred money from Midcontinental [] bank accounts to others for the purpose of executing trades in Illumina securities at Blakstad's direction, and that the proceeds of Illumina trading were then returned to Midcontinental [] bank accounts."  *Id.* at 23.  Therefore, the Government argues that "even if Blakstad had identified some error in the admission of Hinton's testimony or summary charts (and he has not), Blakstad could not establish the 'manifest injustice' showing required to obtain a new trial."  *Id.* at 24.

On the issue of whether Hinton was improperly permitted to testify as a summary witness pursuant to Rule 1006 as opposed to an expert witness under Rule 702, this Court previously considered and rejected defense counsel's argument.  Tr. 827:5–835:13.  Defense counsel argued that in light of the volume of information, nature of Hinton's analysis, and number of hours spent by Hinton and his team, the Government should have provided disclosures pursuant to Rule 16.  *Id.* at Tr. 827:5–19, 831:24–832:24.  The Court ruled that "[t]he testimony that Mr. Hinton proposes to provide, as he testified, is simply

an analysis of money that went into various accounts and then following where the subsequent deductions went to until, I guess, new money came in, because at that point it's no longer the last in," which is a "basic process." *Id.* at Tr. 834:3–7, 834:23–24. The Court held that "all of this is something that I think is within the ken of the average juror," noting that "all of the documents have been produced in this case and therefore qualify as a summary to prove content that I don't believe requires expert testimony." *Id.* at Tr. 835:2–6. Thus, the Court ruled that it would be appropriate to allow Hinton to testify as a summary witness and not as an expert. *Id.* at Tr. 835:11–13.

The Court's ruling stands. First, Rule 1006 permits a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Here, Hinton testified about the results of the "last in, first out" tracing methodology, which involved an analysis of voluminous records to determine the flow of money moving into and out of Blakstad's accounts. Hinton's testimony was not contingent on his scientific, technical, or other specialized knowledge, nor did Hinton use such specialized knowledge to help the jury to understand the evidence or to determine a fact in issue, as required of expert witnesses pursuant to Rule 702. Instead, Hinton's testimony "result[ed] from a process of reasoning familiar in everyday life." *Cuti*, 720 F.3d at 459 (quoting Fed. R. Evid. 701 advisory committee's note, 2000 amend.). Regardless of his specialized knowledge, his testimony was based on his "investigation [into the financial records] and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise," and therefore was not impermissible expert testimony. *Rigas*, 490 F.3d at 224 (finding

that a witness testified as a proper summary witness where he merely "d[id] the math" as to the books and records, but did not testify as to the proper accounting methodology).

Second, even if Hinton's testimony qualified as expert testimony, there was no manifest injustice to Blakstad as a result of a lack of Rule 16 disclosure.  As summarized above, the main documents underlying Hinton's testimony were financial records produced to the defense nearly two years before trial, and the Government disclosed to the defense drafts of the summary charts in the weeks prior to trial, including the tracing analysis, which contained substantially similar information as the final summary charts.  Therefore, Blakstad's motion for a new trial on the grounds of Hinton's testimony is DENIED.

### ii.      Evidence Concerning Tucci's Investment[4]

Second, Blakstad alleges that the Government improperly characterized Tucci as an investor in Midcontinental, as his investment was converted to a promissory note. Therefore, he argues that the alleged total investment in Midcontinental by the scheme's alleged victims was inflated by $750,000, which is the amount Tucci personally loaned to Blakstad.  Mot. for New Trial at 6.

"Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury."  *Id.* at 9 (citing *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).  During an interview before trial, Tucci allegedly informed the Government that the investment he initially made in Midcontinental was converted to a promissory

---

[4] White Sands and its owner, Tucci, are referred to herein as "Tucci," as the parties use the terms interchangeably in their briefing.  *See* Mot. for New Trial, Opp. to New Trial.

note. *Id.* at 6.  Blakstad argues that, notwithstanding this evidence, the Government

elicited testimony from Hinton that Tucci was an investor and that the $750,000 was part

of the total amount invested.  *Id.* at 7–9.  Therefore, according to Blakstad, he was

allegedly "free to spend the $750,000.00 loan as he wanted, including on personal

expenses . . . the very conduct that the prosecutors, supported by Mr. Hinton's tracing

analysis, argued to the jury was criminal." *Id.* at 11.

      In its opposition, the Government argues that its characterization of Tucci as an

investor in Midcontinental was accurate and therefore cannot be grounds for a new trial.

The Government points to its interview with Tucci, which shows that "Tucci was

provided with Midcontinental [] literature that contained numerous misrepresentations,

and Tucci (through White Sands) then made a $750,000 investment on June 14, 2016 in

Midcontinental [] by wiring funds to Midcontinental['s] [] corporate bank account."  Opp.

to New Trial at 24 (citing Doc. 151-4[5]).  The Government alleges that as soon as White

Sands wired the funds to the Midcontinental account based on Blakstad's

misrepresentations, it was defrauded, and any repayment of funds cannot be a defense to

fraud where an individual has devised and executed a scheme with the intent to defraud.

*Id.* at 25–26 (citing cases allegedly holding that "a fraudster cannot retroactively cure a

fraud by repaying his victim or revising the terms of an investment *after* the fraud has

already been committed and the victim defrauded" (emphasis in original)).

      The Government also contends that it provided the defense with reports and

interview notes before trial, and met and conferred with the defense before Hinton's

---

[5] Blakstad cites to and attaches as Exhibit D to his motion for new trial the interview notes of the prosecutors and agents memorializing the Government's interview of Tucci on June 3, 2021, including the Federal Bureau of Investigation Report (FD-302).  Doc. 151-4.  However, because these statements were not put before the jury, they will not be considered on this motion.

testimony regarding the characterization of White Sands as an investor.  *Id.* at 27.

Furthermore, Hinton clearly testified that his analysis was based on assumptions

regarding the investors as given to him by the Government.  *Id.* at 27–28.  Moreover, the

Government argues that this alleged mischaracterization is immaterial to Blakstad's guilt,

because:  (1) the defense cross-examined Hinton about his basis for characterizing Tucci

as an investor and argued in summation that Tucci was not an investor, and (2) Tucci was

but one of the investors who were defrauded, as shown by the testimony from the other

investors, testimony from Blakstad, emails with investors, and other financial records.  *Id.*

at 28.

　　　　　Accordingly, on the issue of whether the characterization of Tucci as an investor

in Midcontinental was inaccurate, Blakstad's motion for a new trial on this basis is

denied.  "In deciding whether a new trial is required due to the prosecutor's knowing

introduction of perjured testimony, the appropriate inquiry depends on the 'materiality of

the perjury to the jury's verdict and the extent to which the prosecution was aware of the

perjury.'"  *United States v. Spinelli*, 551 F.3d 159, 166 (2d Cir. 2008) (quoting *Wallach*,

935 F.2d at 456).  In other words, "[i]n order to be granted a new trial on the ground that

a witness committed perjury, the defendant must show that (i) the witness actually

committed perjury; (ii) the alleged perjury was material; (iii) the government knew or

should have known of the perjury at [the] time of trial; and (iv) the perjured testimony

remained undisclosed during trial."  *Fernandez v. Capra*, 916 F.3d 215, 224 (2d Cir.

2019) (quoting *United States v. Cromitie*, 727 F.3d 194, 221 (2d Cir. 2013) (alteration in

original)).

First, there was arguably no perjury, because Hinton did not testify to the fact that Tucci was an investor – rather, Hinton testified that he treated Tucci as an investor for purposes of his analysis, as this was an assumption provided to him by the Government. Nonetheless, even assuming that Hinton testified to the fact that Tucci was an investor, this fact is not clearly false based on defense counsel's cross-examination of Hinton and Blakstad's testimony regarding Tucci's loan and whether he invested in the Company.

Even if the Court assumes that the Government allowed Hinton to testify perjuriously by characterizing Tucci as an investor, the alleged perjury was not material. "The additional potential for impeachment of [Hinton] would in the circumstances have raised no reasonable likelihood of affecting the jury's verdict," because (1) there was ample evidence related to the other investors in Blakstad's investment fraud scheme and Blakstad's misappropriation of their funds, (2) defense counsel cross-examined Hinton and argued in summation as to the mischaracterization of Tucci as an investor (*see, e.g.*, Tr. 1630:23–1633:17, 1645:9–1647:23), (3) Blakstad testified about Tucci and the loan (*see, e.g.*, *id.* at Tr. 1433:20–1435:8), and (4) the promissory note between Tucci and Blakstad was entered into evidence (*see id.* at Tr. 1434:18–1435:8). Thus, all of the essential facts concerning Tucci's investment were placed before the jury. *Spinelli*, 551 F.3d at 166. Furthermore, Tucci was not the sole or essential source of evidence concerning Blakstad's investment fraud scheme. Where, as here, "independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant a new trial." *United States v. Stewart*, 433 F.3d 273, 300 (2d Cir. 2006) (quoting *United States v. Wong*, 78 F.3d 73, 82 (2d Cir. 1996)).

### iii.      Constructive Amendment

Third, Blakstad alleges that there was a constructive amendment of the S2

Indictment, which occurred when the facts or underlying theory of criminality alleged in

the S2 Indictment varied from what was established at trial.  Mot. for New Trial at 12.

First, Blakstad distinguishes between the allegations contained in Counts 6 and 7 in the

S1 and S2 Indictments.  *Id.* at 14–17.  Specifically, Blakstad argues that the "last minute"

S2 Indictment removed "two-thirds of the basis of the charges (ESI and XACT) in

Counts 6 and 7."[6]  *Id.* at 16.  Second, Blakstad contends that the Government's

presentation of evidence and rebuttal closing argument resulted in a constructive

amendment of Counts 6 and 7.  *Id.* at 18–20.  Specifically, although the Government

originally alleged that Blakstad misrepresented that the investment funds were to be used

for business, not personal, purposes, the Government's closing argument allegedly

"shifted this basis for conviction so that even if all the investors' money were spent for

business purposes, the jury could convict on the basis of other uncharged

misrepresentations."  *Id.* at 13–14.  Blakstad points to the Government's argument that

his misrepresentations to investors that the Midcontinental bank account was dedicated

solely to the Company's business operations, that investors would receive 6% interest per

quarter, that the Company would not pay a salary to its management, and that the

---

[6] The S1 Indictment included two counts related to the investment fraud scheme:  Count 6 (conspiracy to commit securities fraud and wire fraud in violation of 18 U.S.C. § 371) and Count 7 (substantive wire fraud in violation of 18 U.S.C. § 1343).  The counts contained allegations regarding three of Blakstad's companies (Midcontinental, Energy Sources, and XACT) and examples of Blakstad's misrepresentations related thereto.  Opp. to New Trial at 29–30.  Prior to trial, the Government informed the defense and the Court that it intended to simplify its investment fraud case by introducing evidence related only to the Midcontinental investors.  *Id.* at 30.  On approximately June 8, 2021, the Government obtained the S2 Indictment, which contained the same seven counts contained in the S1 Indictment.  *Id.*  The S2 Indictment removed references to the other two entities, but did not make any changes to the underlying theories or charges from the S1 Indictment.  *Id.* at 30–31.

investment funds would be used on energy projects,[7] were each sufficient to prove him guilty of Counts 6 and 7. *Id.* at 18–20. Blakstad further argues that at trial, the Government's theory rested on the new idea that any lie to any investor was sufficient to convict on Counts 6 and 7. *Id.* at 18. Finally, Blakstad alleges that "[e]ven if there is not a constructive amendment, but only a variance, a new trial is required if that variance was prejudicial to the defendant."[8] *Id.* at 21.

In its opposition, the Government argues that the S2 Indictment did not make any changes to the underlying theories or charges from the S1 Indictment, nor did it introduce any new evidence. Opp. to New Trial at 29–31. The Government further alleges that there was no constructive amendment of the S2 Indictment as a result of the evidence presented at trial. The Government first points to the fact that the Court previously considered and denied this very same argument. *Id.* at 33. Furthermore, the Government argues that the allegations regarding Blakstad's investment fraud scheme "all fell squarely within the allegations contained in both the S1 and S2 Indictments." *Id.*; *see id.* at 34 (quoting S1 Indictment at 21), 34–35 (quoting S2 Indictment at ¶¶ 55, 59, 61). Thus, the "core criminality" alleged in both the S1 and S2 Indictments as related to Midcontinental was "a scheme to fraudulently obtain money from those investors through materially false representations about Midcontinental []," which was proved at trial. *Id.* at 35.

---

[7] The Government argued that even if Blakstad used investment funds for the acquisition of Magic Jack, as Blakstad alleged during his testimony, this would also be evidence of fraud, because Magic Jack was not an energy venture. Mot. for New Trial at 19–20.

[8] In support of his argument that there was a constructive amendment or variance, Blakstad cites cases, many of which are out-of-Circuit, involving facts that are distinguishable from those in this case. *Id.* at 13, 20–23. Therefore, the Court finds these cases inapposite.

The Government further argues that, even if there was a variance, it was not prejudicial in light of the pre-trial discovery and the S1 Indictment. *Id.*

On the issue of whether there has been a constructive amendment, this Court previously considered and rejected defense counsel's argument. Tr. 1459:4–1463:7. Blakstad's counsel argued that there was a change in the underlying theories and nature of Counts 6 and 7 due to (1) the removal of two of the three entities (Energy Sources and XACT) contained in the S1 Indictment and (2) the alleged change from misrepresentations regarding fraudulently obtaining and misappropriating investor funds for personal, not business, purposes (as alleged in the S2 Indictment) to any misrepresentation made to an investor, including misrepresentations that were not specified in or based on the S2 Indictment (as allegedly put forth by the Government at trial). *Id.* at Tr. 1459:13–1461:12. The Court held: "I had discerned no change in the government's theory. The theory was that Mr. Blakstad induced certain individuals to invest money in Midcontinental [] for the purposes of developing certain types of businesses, and then he used the money for other purposes. And in the PPM, there were representations concerning how the money would be taken care of and where the money would be placed, and there is evidence that he didn't do that either, arguably, so I don't discern any constructive amendment in this case." *Id.* at Tr. 1462:24–1463:7.

The Court's ruling stands. Blakstad has not established that the presentation of evidence and jury instructions related to his misrepresentations to investors regarding Midcontinental and their investments "so modif[ied] essential elements of the offense charged that there is a substantial likelihood that [Blakstad] may have been convicted of an offense other than that charged in the [S2] [I]ndictment." *United States v. Vilar*, 729

F.3d 62, 81 (2d Cir. 2013) (emphasis omitted).  Blakstad's misrepresentations to investors

regarding where investor funds would be held and how such funds would be utilized, as

shown at trial, were the very same misrepresentations alleged in both the S1 and S2

Indictments.  *Compare* Tr. 1694:4–1697:12 to S1 Indictment at ¶¶ 56–57, 66; *compare* Tr.

1694:4–1697:12 to S2 Indictment at ¶¶ 55, 61.  Therefore, the misrepresentations shown

at trial, which Blakstad alleges were not included in or fairly based on the S1 and S2

Indictments, were either identified or encompassed in the allegations in the indictments

related to misrepresentations about how investor funds would be used only for business

purposes.  Thus, the S2 Indictment was not constructively amended, because as a

"generally framed indictment," it "encompasse[d] the specific legal theory or evidence

used at trial."  *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003) (quoting

*United States v. Wallace*, 59 F.3d 333, 337 (2d Cir. 1995)).

Furthermore, the Second Circuit has "consistently permitted significant flexibility

in proof, provided that the defendant was given *notice* of the *core of criminality* to be

proven at trial."  *Rigas*, 490 F.3d at 228 (emphasis in original).  Here, the "core of

criminality" is Blakstad's investment fraud scheme to fraudulently obtain money from

investors through materially false representations and subsequently misappropriate the

funds for personal, not business, purposes.  Both the S1 and S2 Indictments and the

evidence adduced at trial shared this "core of criminality," and related to a "single set of

discrete facts consistent with the charge[s] in the indictment," with the same "ultimate

purpose" – that Blakstad devised and operated a scheme to fraudulently obtain

investment funds through misrepresentations about Midcontinental and misused the

funds.  *United States v. D'Amelio*, 683 F.3d 412, 419–22 (2d Cir. 2012).

Blakstad's argument that he has been prejudiced due to a variance from the S2 Indictment is similarly without merit.  A variance has not occurred, because the evidence offered at trial did not prove facts materially different from those alleged in the S2 Indictment.  *Salmonese*, 352 F.3d at 621 (citing *United States v. Frank*, 156 F.3d 332, 337 n.5 (2d Cir. 1998)).  As described above, the facts proven at trial were identical or similar to those alleged in the S2 Indictment, as part of the same investment fraud scheme identified in the S2 Indictment.  Moreover, Blakstad has not shown prejudice, which is required to prevail on a variance claim.  *Id.*  Here, Blakstad cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof "substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense."  *Id.* at 621–22 (quoting *United States v. Mucciante*, 21 F.3d 1228, 1236 (2d Cir. 1994)).  Specifically, the S2 Indictment gave Blakstad fair and adequate notice that the conspiratorial investment fraud scheme achieved its ultimate purpose through the misrepresentations regarding Midcontinental and the purported use of the investment funds.  *Id.* at 622.

### iv.   The Government's Summation

Fourth, Blakstad argues that the Government's "repeated assertions of their personal opinion that Mr. Blakstad had lied under oath at trial was plain error."[9]  Mot. for New Trial at 24.  Specifically, Blakstad argues that he was prejudiced by the following arguments:

---

[9] In his reply, Blakstad provides examples of the Government allegedly speculating about Blakstad's motives and plans to fabricate testimony, asserting that defense counsel knew Blakstad was lying, and vouching for the credibility of the Government's witness, all of which allegedly constitute plain error. Reply for New Trial at 7–9.

(1) Blakstad planned to and did fabricate testimony;

(2) Defense counsel was aware that Blakstad lied during his testimony; and

(3) The Government's witness, Bustos, had incentive to tell the truth during her testimony.

Reply for New Trial at 7–9.[10]

At the outset, it bears noting that Blakstad did not object to these arguments at trial.  Reversal of a conviction is justified only if a prosecutor's improper remark "causes the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process."  *United States v. Williams*, 642 F. App'x 12, 16 (2d Cir. 2016) (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999)).  "In assessing whether a defendant has sustained substantial prejudice, we consider the severity of the alleged misconduct, any curative measures taken by the trial court, and the likelihood of conviction absent the challenged conduct."  *Id.* (quoting *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004)).  "Where . . . the defendant did not object at trial to the statements forming the basis of his appeal, the plain error standard applies, requiring us to reject any assignment of error that does not 'amount to flagrant abuse' which 'seriously affects the fairness, integrity, or public reputation of judicial proceedings,' and causes 'substantial prejudice' to the defendant."  *United States v. Williams*, 690 F.3d 70, 75 (2d Cir. 2012) (quoting *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005)).  The Government's arguments at trial that Blakstad had lied under oath, that defense counsel knew Blakstad was lying, and that the Government's cooperating witness was credible did not constitute plain error.

---

[10] Blakstad relies on Fourth Circuit cases to argue that the Government's arguments constitute plain error. Mot. for New Trial at 24.  As further detailed below, courts in this Circuit have held to the contrary.

First, the Government allegedly speculated regarding Blakstad's testimony at trial concerning the Illumina trades and Midcontinental, and asserted that:

(1) "He has had all of that time to think about his testimony.  What am I going to say? How am I going to explain this trade? . . . This is a ginned-up excuse made for this trial.  It's a lie" (Tr. 1570:3–11);

(2) "What if I come up with this zany idea about bundling and customer lists? . . . So I'll just get up on the stand and lie" (*id.* at Tr. 1609:5–22); and

(3) "You know who took this stand and repeatedly lied?  The defendant.  He took an oath like everybody else and he provided fabricated testimony to you for hours on the witness stand" (*id.* at Tr. 1689:15–20).

In its opposition, the Government asserts that its argument at trial as to whether Blakstad had lied under oath was appropriate and therefore cannot be grounds for a new trial.  When Blakstad testified at trial, he "put his credibility squarely at issue," and therefore "it was entirely proper for the Government to argue that the evidence demonstrated that Blakstad presented a fabricated story to the jury."  Opp. to New Trial at 36.

"A prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation."  *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992) (citing *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir. 1975)).  Furthermore, where the defendant's credibility is at issue as a result of testifying, the government can "properly comment[] on his untruthfulness."  *United States v. Ngono*, 801 F. App'x 19, 25 (2d Cir. 2020) (finding that the government's assertions that defendant "lied" in the courtroom were permissible).  Here, where Blakstad's credibility was clearly at issue as a result of his testimony, the Government's use of the words "lie" and "lied" were permissible.  *See United States v. Coriaty*, 300 F.3d 244, 255 (2d Cir. 2002) ("On many occasions, we have upheld convictions after a summation including negative characterizations of witness

credibility.  'Use of the words "liar" and "lie" to characterize disputed testimony when
the witness's credibility is clearly in issue is ordinarily not improper unless such use is
excessive or is likely to be inflammatory.'" (quoting *United States v. Peterson*, 808 F.2d
969, 977 (2d Cir. 1987))).  However, where "the government speculate[s] as to [the
defendant's] state of mind," the Second Circuit has found such speculation, unsupported
by evidence in the record, "crosse[s] the line between zealous advocacy and improper
argument." *United States v. Bell*, 420 F. App'x 33, 35–36 (2d Cir. 2011) (finding that
such assertions, while improper, did not amount to flagrant abuse).

While the Government's assertions regarding Blakstad's plan to fabricate
testimony may arguably fall outside the scope of merely arguing that Blakstad lied on the
stand, in the context of the entire summation, it was clear that these statements were
based on the evidence, not the Government's personal beliefs. *Williams*, 642 F. App'x at
16.  In connection with the first statement regarding Illumina's earnings announcements
and Blakstad's trading activity, the Government argued that "based on the evidence in the
record," including testimony from Bustos, "phone records, bank records, brokerage
records," and "text messages," Blakstad's explanations as to his trading did not make
sense.  Tr. 1568:6–1574:1.  In connection with the second statement regarding
Midcontinental and Blakstad's representations to its investors, the Government submitted
to the jury that "the record shows that" Blakstad's testimony is a fabrication, argued that
"the evidence doesn't support" Blakstad's assertions, and referred to the testimony from
his investors and bank records. *Id.* at Tr. 1608:21–1611:11.  In connection with the third
statement regarding Blakstad's lying on the stand, the Government points to Blakstad's

bank account records, testimony from Bustos, and evidence of Blakstad's conspiring with Ryan Morris, Michael Winston, and Robert Maron.  *Id.* at Tr. 1688:3–1689:21.

Moreover, because the defense did not object to these statements at trial, even if the Government's statements as to Blakstad's motives and plans to fabricate testimony were improper, it is highly unlikely that these assertions were "plain error" amounting to "flagrant abuse," in light of the testimony from the investors in Midcontinental, Bustos' testimony, and the financial records and communications related to Illumina's earnings announcements.

Second, the Government argued that:

(1) defense counsel is "aware that his client's story is a fabrication and can't even be relied on," and therefore "essentially walks away from it in summation and just tries to start blaming everybody and everything" (*id.* at Tr. 1685:8–16);

(2) defense counsel "sees clear-cut evidence of insider trading so they're trying to cobble together some theory" and "just dump [documents] into evidence and see if the jury will buy it" (*id.* at Tr. 1690:1–6); and

(3) the Government "[doesn't] know how Mr. Iredale can make this argument with a straight face" (*id.* at Tr. 1690:1–6).

It is well-settled that arguments that the defense is "grasp[ing] at straws," "focus[ing] on distractions," and "attempt[ing] to take [the jury's] eyes off the ball," as well as assertions that the defense's case is "hog wash" or a "smoke screen," are not improper attacks on defense counsel that require reversal.  *Williams*, 690 F.3d at 75–76. These types of assertions are "a far cry, indeed, from the sort of sustained attack on the integrity of defense counsel that [the Second Circuit] held to be reversible error in *United States v. Friedman*, 909 F.2d 705, 708 (2d Cir. 1990) (reversing a conviction where, *inter alia*, the prosecution stated in summation that 'some people [defense counsel] would have you pull down the wool over your eyes and forget all that, because while some

people . . . go out and investigate drug dealers and prosecute drug dealers and try to see them brought to justice, there are others who defend them, try to get them off, perhaps even for high fees') (omission in original)." *Id.* at 75.  However, the government "should not [] place[] defense counsel's credibility at issue." *Williams*, 642 F. App'x at 16 (citing *Friedman*, 909 F.2d at 709) (finding that the government "improperly made assertions about defense counsel's subjective beliefs," when it argued that "[t]he reason [defense counsel] is trying to distract you is that if you focus on the evidence, if you focus on the facts, it is all over," and that "[h]is client is done, and he knows that," *id.* at 16–17).

In connection with all three statements, the Government points to evidence in the record such as testimony from Bustos and Blakstad, and records of trading activity and communications. *See, e.g.*, Tr. 1687:8–1693:8.  Again, the defense did not object to these statements at trial.  The Government's statements about defense counsel's awareness that Blakstad's story was a fabrication and could not be relied on are improper, because they tend to suggest to the jury that the defense counsel was aware of facts not in evidence. *See United States v. Buell*, 229 F.3d 1136 (2d Cir. 2000) (affirming district court opinion holding that the government's summation "crossed the line of propriety" when it argued that the defense "did not rely in any way whatsoever on the sworn testimony provided by her client" and "[didn't] rely on the credibility of her client").  Nonetheless, while improper, in the context of the entire summation, these assertions did not constitute "plain error" resulting in "flagrant abuse," in light of the testimony from Bustos and Blakstad, and the other record evidence in the case. *See, e.g.*, Tr. 1687:8–1693:8.

Third, the Government asserted that if Bustos, the Government's witness, lies, "she gets no protection and she can be prosecuted for perjury or obstruction of justice."

*Id.* at Tr. 1687:20–22.  It is "well established that the prosecution may not vouch for its witnesses' credibility."  *Newton*, 369 F.3d at 681.  Prosecutorial vouching may "suggest[ ] to a jury that there is additional evidence, not introduced at trial but known to the prosecutor, that supports the witness's credibility" or may "induce the jury to trust the Government's judgment rather than its own view of the evidence."  *Id.* (quoting *United States v. Young*, 470 U.S. 1, 18–19 (1985)).  "A prosecutor does not engage in impermissible vouching by offering reasons to credit a witness's testimony or posing rhetorical questions about the witness's motive to lie."  *Williams*, 642 F. App'x at 16 (citing *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)).  Here, the Government's argument as to Bustos' motive to tell the truth does not constitute improper prosecutorial vouching, but "permissible 'simple, common-sense argument.'"  *United States v. Williams*, 787 F. App'x 8, 12 (2d Cir. 2019) (quoting *Carr*, 424 F.3d at 229 (finding that the government's statements that cooperating witnesses had to tell the truth and speculation on such motivations to tell the truth were permissible)) (holding that the government's statements that cooperating witnesses "knew that if they lied, they would get caught" were permissible, *id.* at 11).

In connection with this statement regarding Bustos' motive to tell the truth, the Government explained that "[h]er cooperation agreement is in evidence," Tr. 1687:19–20, and further explained how Bustos' testimony was "corroborated also by other evidence."  *Id.* at Tr. 1687:22–23.  Moreover, the defense did not object to this statement at trial.  Therefore, even if this statement as to Bustos' incentive to testify truthfully was improper, it is highly unlikely that this assertion was "plain error" resulting in "flagrant abuse."

## IV.    MOTION TO DISMISS

Blakstad moves to dismiss Counts 6 and 7 pursuant to Federal Rule of Criminal Procedure 12 for failure to state an offense and for lack of specificity.  Blakstad argues that the Government's "last minute changes in its theory of prosecution were based on its new fact-free charges in Counts 6 and 7, which failed to set forth a specific description of a scheme or artifice to defraud or a recitation of alleged material misrepresentations for which it sought a conviction."[11]  Mot. to Dismiss at 1.  While Blakstad admits that motions pursuant to Rule 12 must be raised prior to trial or are otherwise untimely unless the party shows "good cause," Blakstad argues that such "good cause" exists here where the Government obtained a "last minute indictment" while he and his counsel were preparing and traveling for trial, which deprived Blakstad's counsel of reasonable time to research the issue of sufficiency for Counts 6 and 7.[12]  Id. at 1–2 (citing Fed. R. Crim. P. 12(b)(3)(B)).

In its opposition (Doc. 157 ("Opp. to Dismissal")), the Government argues that the motion is untimely, and fails on the merits.  First, the Government contends that the S2 Indictment "included precisely the same charges and counts as the S1 Indictment,"

---

[11] In support of his argument that Counts 6 and 7 should be dismissed, Blakstad cites cases allegedly stating that it is not sufficient to merely plead little more than the statutory language in the wire fraud context. Mot. to Dismiss at 2, 5–8.  Notwithstanding the fact that these cases are mostly out-of-Circuit, courts in this Circuit have held to the contrary, as further described below.

[12] In his reply in support of his motion to dismiss, Doc. 158 ("Reply for Dismissal"), as in his motion for a new trial on the basis of constructive amendment, Blakstad highlights the differences between the S1 and S2 Indictments, and argues that the Government submitted the S2 Indictment to "delete any specification of a scheme to defraud, any specification of a particular false statement or misrepresentation, and entirely deleted the essential allegation that the defendant was prepared to refute:  that the scheme to defraud involved spending investors' funds on personal consumption as opposed to business purposes," a deletion which allowed the Government to "fill in the blanks by arguing that whatever it showed at trial matched the new charges in Counts 6 and 7."  Reply for Dismissal at 3–4.  As stated above in connection with Blakstad's motion for a new trial, upon comparison of the S1 and S2 Indictments, the two indictments contain precisely the same offenses and "core of criminality" in Counts 6 and 7.

which was filed on January 8, 2020.  Opp. to Dismissal at 38.  Furthermore, on June 9,

2021, prior to trial, Blakstad filed a motion to dismiss, among others, these very same

counts, which allegedly demonstrates that Blakstad's counsel had "diligently reviewed

and assessed the S2 Indictment for potential motions to dismiss."  *Id.* (citing Doc. 109).

Finally, the Government alleges that during the oral argument before trial on June 10,

2021, Blakstad's counsel "demonstrated he had thoroughly considered the S2 Indictment

and its potential trial implications at that time."  *Id.*

      Second, the Government argues that the detail and specificity in the S2 Indictment

distinguish it from the cases cited by Blakstad in which courts have found indictments

insufficient.  *Id.* at 39.  Not only do Counts 6 and 7 "track the language of the statute

charged and state the time and place (in approximate terms) of the alleged crime," but

they allege additional factual detail beyond the statutory language.  *Id.* (citing S2

Indictment at ¶¶ 55, 59).  Finally, the Government argues that Blakstad cannot establish

that he was prejudiced in light of the pre-trial discovery, filings, and representations made

to him before trial, outlining his alleged crimes.  *Id.* at 40.

    **A.**    **Legal Standard**

      A defendant may move to dismiss an indictment on the ground that it is defective

under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure.  However, a motion

alleging a defect in the indictment, including lack of specificity and failure to state an

offense, must be made before trial.  Fed. R. Crim. P. 12(b)(3)(B).  *See also United States

v. Spero*, 331 F.3d 57, 61 (2d Cir. 2003) ("any challenge to an indictment must be brought

prior to trial . . . .").  In relevant part, Rule 12(c)(3) provides:  "If a party does not meet

the deadline for making a Rule 12(b)(3) motion, the motion is untimely.  But a court may

consider the defense, objection, or request if the party shows good cause."  "Good cause"
under Rule 12(c)(3) requires "[a]t a minimum" that "the party seeking a waiver articulate
some legitimate explanation for the failure to timely file."  *United States v. Archuleta*, No.
02 Cr. 1060 (LAP), 2018 WL 8646703, at *2 (S.D.N.Y. July 31, 2018) (quoting *United
States v. Billings*, No. 15 Cr. 50 (LJV) (JJM), 2016 WL 6772038, at *2 (W.D.N.Y. Oct. 5,
2016)).

      An indictment "must be a plain, concise, and definite written statement of the
essential facts constituting the offense charged," and "must give the official or customary
citation of the statute, rule, regulation, or other provision of law that the defendant is
alleged to have violated."  Fed. R. Crim. P. 7(c)(1).  "An indictment is sufficient if it
'first, contains the elements of the offense charged and fairly informs a defendant of the
charge against which he must defend, and, second, enables him to plead an acquittal or
conviction in bar of future prosecutions for the same offense.'"  *United States v. Stringer*,
730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117
(1974)).  In order to satisfy these requirements, "an indictment need do little more than to
track the language of the statute charged and state the time and place (in approximate
terms) of the alleged crime."  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir.
1992) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).  Thus, the
indictment need only allege "the 'core of criminality' the government intend[s] to prove"
at trial, and consequently, the indictment is "read . . . to include facts which are
necessarily implied by the specific allegations made."  *Rigas*, 490 F.3d at 229 (citation
omitted).  Where the charged crime "involves making false statements, the 'core of
criminality' is not the substance of the false statements but rather that knowing falsehoods

were submitted." *Id.* (quoting *United States v. Sindona*, 636 F.2d 792, 797 (2d Cir. 1980)) (internal quotation marks omitted).

When evaluating the sufficiency of an indictment, the court considers all allegations in the indictment to be true and does not consider any contrary assertions of fact by the defendant. *See United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985); *see also United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998) (opining that a court focuses on the legal sufficiency of the indictment itself, without ruling on the legal sufficiency of the evidence). Therefore, "[a] defendant challenging the sufficiency of an indictment on a motion to dismiss faces a high hurdle." *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *2 (S.D.N.Y. Dec. 11, 2017).

Courts have generally applied these standards to indictments containing counts of securities and wire fraud and conspiracy to commit such fraud. *See, e.g.*, *United States v. Kozel*, No. 19 Cr. 460 (KMW), 2020 WL 4751498, at *2 (S.D.N.Y. Aug. 17, 2020) (denying motion to dismiss indictment, because "[e]ach count of the Indictment . . . sets forth the elements of the offenses alleged, and states the approximate time period during which the violation is alleged to have occurred," and finding that "by providing Defendant with a narrative of the manner in which Defendant is alleged to have committed the charged offenses, the Indictment provides Defendant with more detail than is strictly necessary"); *United States v. Gatto*, 295 F. Supp. 3d 336, 341 (S.D.N.Y. 2018) (denying motion to dismiss indictment containing conspiracy to commit wire fraud where it "track[ed] the language of [the federal wire fraud statute]," and opining that "extensive factual allegations as to when, how and with whom the alleged scheme was undertaken . . . [were] more than sufficient to inform defendants of the particulars of the alleged

conspiracy in which they are charged with having participated"); *Percoco*, 2017 WL
6314146, at *7–8 (finding that indictment sufficiently alleged wire fraud because it "need
only track the language of the statute"); *United States v. Kim*, No. 09 Cr. 1160 (DLC),
2010 WL 1780959, at *2–3 (S.D.N.Y. May 4, 2010) (denying motion to dismiss count of
conspiracy to commit wire fraud and finding that the indictment, which "specifie[d] the
statutes that [defendant] is alleged to have violated, state[d] the elements of the crimes
charged, and identifie[d] the approximate time and place of the alleged acts," met and
exceeded the standard of sufficiency); *United States v. Falkowitz*, 214 F. Supp. 2d 365,
374 (S.D.N.Y. 2002) (denying motion to dismiss count of conspiracy to commit wire
fraud where indictment "track[ed] the express language of the statutes and
unambiguously state[d] the elements that constitute the offenses charged"); *United States
v. Zandstra*, No. 00 Cr. 209 (RWS), 2000 WL 1368050, at *3 (S.D.N.Y. Sept. 20, 2000)
(finding sufficient a count of conspiracy violating 18 U.S.C. § 371).

   **B.    Discussion**

   Blakstad's motion to dismiss is not timely.  Furthermore, Blakstad's argument that
he did not have sufficient time to assess the sufficiency of Counts 6 and 7 in the midst of
trial preparation fails, because it does not establish good cause.  Here, the S2 Indictment
was filed six days before trial, and contained the very same counts as the S1 Indictment.
*See United States v. Beras*, No. 99 Cr. 75 (SWK), 2004 WL 1418022, at *2 n.2 (S.D.N.Y.
June 23, 2004), *aff'd*, 131 F. App'x 313 (2d Cir. 2005) (finding that there was "good
cause" for defendant's failure to file a Rule 12(b)(3)(A) motion before trial where
defendant may not have received the relevant information to make such motion until
during trial).  Furthermore, Blakstad's counsel did, in fact, file a pre-trial motion to

dismiss several counts in the S2 Indictment on June 9, 2021, including Counts 6 and 7 (Doc. 109 at 2–4), and argued issues in connection to the S2 Indictment, including Counts 6 and 7—which overlap with or relate to Blakstad's motion to dismiss—at an oral argument before the Court on June 10, 2021 before the trial (Tr. 17:9–22:6).

Even if Blakstad has shown "good cause" for his untimely motion, it fails on the merits.  Here, Counts 6 and 7 track the language of the relevant statutes and state the elements of each offense.  Count 6 is brought pursuant to 18 U.S.C. § 371, which reads, in relevant part, that it shall be unlawful if "two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy."  18 U.S.C. § 371.  The elements of a conspiracy charge are:  (1) an agreement between the defendant and at least one other person to commit an offense; (2) the defendant knowingly participated in the conspiracy with the specific intent to commit the illegal object of the conspiracy; and (3) during the conspiracy an overt act in furtherance of the illegal objective was committed by a member of the conspiracy.  *See United States v. Salameh*, 152 F.3d 88, 145–46 (2d Cir. 1998).

Count 7 is brought pursuant to 18 U.S.C. §§ 1343 and 2.  18 U.S.C. § 1343 states, in part:  "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be

fined under this title or imprisoned not more than 20 years, or both." *See also* 18 U.S.C.
§ 2 ("Whoever commits an offense against the United States or aids, abets, counsels,
commands, induces or procures its commission, is punishable as a principal."). The
elements of wire fraud include (1) a scheme to defraud (2) to get money or property (3)
furthered by the use of interstate wires. *Autuori*, 212 F.3d at 115.

      Counts 6 and 7 each contain "a plain, concise, and definite written statement of
the essential facts constituting the offense charged," and "give the official or customary
citation of the statute, rule, regulation, or other provision of law that [Blakstad] is alleged
to have violated." Fed. R. Crim. P. 7(c)(1); *see also* S2 Indictment at ¶¶ 55–59, 61.
Furthermore, each count "first, contains the elements of the offense charged and fairly
informs [Blakstad] of the charge against which he must defend, and, second, enables him
to plead an acquittal or conviction in bar of future prosecutions for the same offense."
*Stringer*, 730 F.3d at 124 (quoting *Hamling*, 418 U.S. at 117); *see also* S2 Indictment at
¶¶ 55–59, 61. Counts 6 and 7 "track the language of the statute charged and state the
time and place (in approximate terms) of the alleged crime." *Stavroulakis*, 952 F.2d at
693 (quoting *Tramunti*, 513 F.2d at 1113); *see* S2 Indictment at ¶¶ 56, 61. In summary,
Counts 6 and 7 are each sufficient, because they allege that Blakstad's conduct violated
18 U.S.C. § 371 and 18 U.S.C. §§ 1343 and 2, respectively, track such statutes, set forth
the elements of the charged crimes of conspiracy and wire fraud, identify the approximate
time and place of the alleged acts, and state the nature of the fraudulent scheme that was
the subject of the conspiracy. *See, e.g.*, *Kozel*, 2020 WL 4751498, at *2 (denying motion
to dismiss indictment containing counts of conspiracy to commit wire fraud and wire
fraud); *Kim*, 2010 WL 1780959 (denying motion to dismiss count of conspiracy to

commit wire fraud); *Zandstra*, 2000 WL 1368050, at *3 (finding sufficient a count of conspiracy violating 18 U.S.C. § 371).

Moreover, Counts 6 and 7 specify the overt acts committed in furtherance of the conspiracy and to effect its illegal objects, which provide factual detail about the approximate time periods during which the conspiracy took place, the approximate locations from which the scheme was allegedly operated, the nature of the fraudulent scheme in which Blakstad and his co-conspirators are alleged to have participated, the use of wires in furtherance of such scheme, and overt acts taken in furtherance of the conspiracy.  *See* S2 Indictment at ¶¶ 59–60.  By providing a narrative of the manner in which Blakstad is alleged to have committed the charged offenses, Counts 6 and 7 have met and exceeded the standard of sufficiency, as they provided Blakstad with more detail than is strictly necessary.  *See, e.g.*, *Kozel*, 2020 WL 4751498, at *2; *Kim*, 2010 WL 1780959, at *2; *Zandstra*, 2000 WL 1368050, at *3.

V.     **CONCLUSION**

For the reasons set forth above, Blakstad's motions are DENIED.  The Clerk of the Court is respectfully directed to terminate the motions, Docs. 150, 151, and 152.

It is SO ORDERED.

Dated:     November 9, 2021
           New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.